[This opinion has been published in *Ohio Official Reports* at 69 Ohio St.3d 451.]

STINSON ET AL., APPELLANTS, V. ENGLAND, APPELLEE.

[Cite as *Stinson v. England*, 1994-Ohio-35.]

*Evidence—Admissibility of expert testimony that an event is the proximate cause—Event is probable, when—Expert opinion regarding causative event must be expressed in terms of probability—Treatise may be used for impeachment purposes to demonstrate that expert witness is either unaware of the text or unfamiliar with its contents—Substance of treatise employed only to impeach credibility of expert witness who has relied upon treatise.*

1. The admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative event in terms of probability. (*Shepherd v. Midland Mut. Life Ins. Co.* [1949], 152 Ohio St. 6, 39 O.O. 352, 87 N.E.2d 156, paragraph two of the syllabus, followed.) An event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue. (*Cooper v. Sisters of Charity of Cincinnati, Inc.* [1971], 27 Ohio St.2d 242, 253, 56 O.O. 2d 146, 152, 272 N.E.2d 97, 104, followed.) Inasmuch as the expression of probability is a condition precedent to the admissibility of expert opinion regarding causation, it relates to the competence of the evidence and not its weight. (*State v. Benner* [1988], 40 Ohio St.3d 301, 313, 533 N.E.2d 701, 714, followed.) Consequently, expert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue.

2. The learned treatise exception to the hearsay rule set forth in Fed. Evid R. 803(18) has no counterpart in Ohio Evid. R. 803. In Ohio, a learned treatise may be used for impeachment purposes to demonstrate that an expert

witness is either unaware of the text or unfamiliar with its contents. Moreover, the substance of the treatise may be employed only to impeach the credibility of an expert witness who has relied upon the treatise (*Hallworth v. Republic Steel Corp.* [1950], 153 Ohio St. 349, 355-356, 41 O.O. 341, 343-344, 91 N.E.2d 690, 694) or has acknowledged its authoritative nature.

(No. 92-2444—Submitted October 20, 1993—Decided June 15, 1994.)

A<span>PPEAL</span> from the Court of Appeals for Montgomery County, No. 13073.

————————————

{¶ 1} On April 11, 1985, plaintiff-appellant Carol Stinson consulted defendant-appellee, Dr. Stephen England, regarding her pregnancy with her fourth child. At that time, her estimated date of delivery was October 19, 1985. She reminded appellee that her previous child had been born late and expressed similar concern regarding this pregnancy. She made routine visits to the office of appellee thereafter. On October 15, 1985, she consulted appellee and again expressed her concern regarding an extended gestation period. There is a potential for brain damage in a fetus due to the deterioration of the placenta during a prolonged pregnancy. She was assured by appellee at that time that she was not ready to deliver. Pursuant to his instructions, appellant returned to his office on October 22, 1985, when she again expressed her concerns regarding a late delivery. Appellee remarked that if she did not deliver by October 29, 1985, labor would be induced the next day.

{¶ 2} On October 29, 1985, appellant visited the offices of appellee. Appellee was not available at that time. Instead, a nurse in his employ instructed appellant to return on October 31, 1985. On that date, appellee told appellant that he would induce labor on November 2. On November 1, 1985, appellant contacted the office of appellee, notified a nurse in his employ that she had not felt the baby move all of that morning, and then proceeded to the office of appellee. While

appellee was unavailable, his nurse confirmed the existence of a fetal heartbeat and sent appellant home.

{¶ 3} At approximately 11:00 p.m. on November 1, 1985, appellant began experiencing regular contractions. She notified appellee and, pursuant to his instructions, travelled to the hospital, arriving at approximately midnight. At approximately 3:00 a.m., appellee arrived at the hospital. Concluding that appellant was completely dilated, appellee proceeded with vaginal delivery. At approximately 3:30 a.m., plaintiff-appellant Julie Stinson was born. She has since been diagnosed as suffering severe mental impairment.

{¶ 4} On August 31, 1988, appellants instituted the present action in the Montgomery County Court of Common Pleas against appellee for medical malpractice. On July 16, 1991, trial commenced. Appellants presented the testimony of Dr. Stanley M. Warner that certain tests were available in 1985 which should have been given by appellee at the end of the forty-first week of gestation to determine if the baby was in distress. On cross-examination, Dr. Warner was questioned as follows:

"Q. What text do you use for obstetrics teaching?

"A. I don't.

"***

"Q. *Williams on Obstetrics* is an acceptable textbook used by a majority of the medical schools in the United States; isn't that correct?

"A. I cannot speak to that, sir. I don't know if it is used by the majority. ***

"***

"Q. Let's see what Williams says.

"A. *That's not authoritative*, Williams is not. There are many mistakes in that book.

"Q. I thought you said it was authoritative.

"A. I did not. I have not even been asked whether I considered it authoritative or not ***.

"Q. Well, I think you have testified previously that you considered *Williams on Obstetrics* part authoritative and part non authoritative, is that right?

"A. That's right. There are parts of it that are not authoritative and there are parts that are. *I don't consider it an authoritative text book*.

"***

"Q. Now let's see if you disagree or agree with a statement taken from *Williams on Obstetrics* published in 1985.

"MR. SHAVER: Same objection, Your Honor. [Lack of foundation for cross-examination from treatise.]

"THE COURT: The Court is going to overrule the objection. This witness had testified with regard to the standards in 1985 and I think it is appropriate to test that knowledge.

"Q. Quote, Too often time and effort and emotion are expended on cases in which gestational age is less than 42 weeks period end quote. You disagree with that, I take it, right?" (Emphasis added.)

{¶ 5} Also during cross-examination, Dr. Warner was asked what percentage of his income derived from providing expert testimony in medical malpractice actions. Dr. Warner revealed that approximately twenty-five percent of his income had been derived in this fashion. When he was asked whether he had set up a corporation through which he passed his fees received for testifying, he stated that the fee from his testimony in the present case would be transmitted to Blackhawk Community Health Care in Rhode Island. Blackhawk is a nonprofit health care center providing medical treatment to low income patients. A motion to strike this answer as nonresponsive was granted by the trial court. The jury was instructed to disregard the remark. On redirect examination, Warner was asked what he would do with the fee from this case, and he made the same statement.

4

Without stating a reason, the court sustained an objection and a motion to strike and instructed the jury to disregard the statement.

{¶ 6} On direct examination, appellee elicited the testimony of Dr. Diana Ross. Dr. Ross stated that the type of injuries suffered by Julie Stinson could be caused by three events: (1) maternal hypotension, (2) placental insufficiency (*i.e.*, the theory of appellants), or (3) compression of the umbilical cord. Of these three possibilities, Dr. Ross stated that the "most likely" cause of the injuries was the compression of the umbilical cord.

{¶ 7} On July 23, 1991, following trial, the jury returned a general verdict in favor of appellee. In response to interrogatories, the jury concluded that appellee had been negligent in failing to properly monitor fetal movement, but that this negligence was not the proximate cause of the injuries to appellant. On August 30, 1991, judgment was entered for appellee. On October 5, 1992, the Second District Court of Appeals affirmed the judgment of the trial court.

{¶ 8} The cause is now before this court pursuant to the allowance of a motion to certify the record.

———————————

*Wolske & Blue*, *Michael S. Miller* and *Walter J. Wolske, Jr.*, for appellants.

*Beiser, Greer & Landis* and *Leo F. Krebs*, for appellee.

———————————

I

**A. WILLIAM SWEENEY, J.**

{¶ 9} Appellants challenge the judgment entered in favor of appellee on three bases. First, appellants dispute the admissibility of the testimony of Dr. Ross regarding the cause of the injuries to Julie Stinson. Dr. Ross expressed the opinion that, of three possible causes for injuries of the type sustained by Julie Stinson, including the cause advanced by appellants (*i.e.*, placental insufficiency attributable to the negligence of appellee), the "most likely" cause for the injuries was

compression of the umbilical cord.  Appellants contend that this testimony was incompetent because expert testimony regarding causation must concern the probable cause of the occurrence, not possible causes.  Appellants correctly maintain that probability means more than a fifty percent likelihood and that the most likely of three causes may represent the greatest possibility (*e.g.*, forty percent) but nevertheless fall short of probability.  Appellants therefore contend that the witness did not testify as to probabilities and that the testimony was incompetent as a result.

{¶ 10} Appellee responds that the three explanations given by Dr. Ross were hypothetical and that at least one of them, maternal hypotension, was eliminated in this case.  Thus, the phrase "most likely" was used regarding the only two remaining options.  Appellee further contends that, with respect to causation, appellants bear the burden of persuasion.  Accordingly, he argues, any dispute regarding the expression of probability by his expert is irrelevant because it was incumbent upon appellants to demonstrate that placental insufficiency due to the negligence of appellee was the cause of the injuries.

{¶ 11} The positions of the parties each contain some merit.  In Ohio, the admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative event in terms of probability.  *Shepherd v. Midland Mut. Life Ins. Co.* (1949), 152 Ohio St. 6, 39 O.O. 352, 87 N.E.2d 156, paragraph two of the syllabus.  Appellants correctly observe that an event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue.  *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 253, 56 O.O. 2d 146, 152, 272 N.E.2d 97, 104; *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 265, 553 N.E.2d 1038, 1051.

{¶ 12} Appellee responds, however, that the requirement of demonstrating probability is limited to expert testimony adduced on behalf of the party bearing

the burden of persuasion. Therefore, appellee contends, an expert who testifies on behalf of a defendant need not express an opinion regarding causation in terms of probability, because it is the plaintiff who bears the burden to prove that the proximate cause of the injuries was the negligence of the defendant. We disagree. While the probability standard arises most frequently in the context of testimony by an expert witness on behalf of the plaintiff, it is not limited to those circumstances.

{¶ 13} Appellee has accurately noted that appellants bear the burden of persuasion with respect to every aspect of their claim, including causation. Nevertheless, the probability requirement applicable to expert opinion testimony is not limited to that adduced by appellants. Inasmuch as the expression of probability is a condition precedent to the admissibility of expert opinion regarding causation, it relates to the competence of such evidence and not its weight. See *State v. Benner* (1988), 40 Ohio St.3d 301, 313, 533 N.E.2d 701, 714. Accordingly, it is essential to focus on the quality of the evidence adduced regardless of the identity of its proponent.

{¶ 14} In this regard, appellee has confused the burden of persuasion, which is generally borne by the plaintiff in a negligence action, and the duty imposed upon the proponent of a fact to adduce competent evidence sufficient to establish its existence. The former burden was and continued to be the responsibility of the appellants. In order to present a jury question and avoid a directed verdict, appellants were required to satisfy the burden of production by establishing a prima facie case. See 2 McCormick, Evidence (4 Ed. Strong Ed. 1992) 425, Section 336. This burden is satisfied by adducing competent evidence supporting the existence of a duty, breach of the duty, causation based on probability and damages. Once a prima facie case has been demonstrated, the adverse party may attempt to negate its effect in various ways. He may cross-examine the expert of the other party. He may adduce testimony from another expert which contradicts the testimony of the

expert for his adversary. Further, he may adduce expert testimony which sets forth an alternative explanation for the circumstances at issue. If this last approach is pursued, the evidence directed to the alternate explanation is governed by the same standard of admissibility applicable to the evidence adduced by his adversary. Thus, in *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 110, 52 O.O.2d 395, 398, 263 N.E.2d 235, 239, we noted:

"'It is a general rule that the burden of proving facts which must be established in order to make evidence admissible is on the party who wishes to give such evidence.' 1 Jones on Evidence, 387, Section 210. 'The party offering testimony has the burden of establishing its admissibility; and where there is a preliminary question of fact to be decided before evidence is admitted, the burden of proving the preliminary fact rests upon the proponent of the subject evidence.' 31A Corpus Juris Secundum 168, Evidence, Section 103."

{¶ 15} We therefore conclude that expert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue.

{¶ 16} Applying the foregoing standard to the case at bar, we note at the outset that appellants bore the burden of persuasion to demonstrate that the injuries sustained by Julie Stinson were proximately caused by the negligence of appellee. A prima facie demonstration with respect to causation was accomplished through the testimony of Dr. Warner, who stated that the probable cause of the injuries was the negligence of appellee. This evidence along with evidence directed to other elements of the claim established a prima facie case so as to present a jury question and avoid a directed verdict. Among the devices available to appellee to meet this prima facie case were the cross-examination of Dr. Warner, the presentation of contrary evidence that the negligence of appellee was not the probable cause of the injuries or the presentation of evidence establishing an alternative cause for the

injuries. Where this last approach is pursued, the proponent of the alternative cause theory must support the theory with competent evidence establishing its truth. That is, a proponent of an alternative cause must adduce expert testimony of its probable nature.

{¶ 17} With these principles in mind, we now address the argument of appellants that the expert witness on behalf of appellee failed to express an opinion with respect to causation sufficient to satisfy the requisite standard of probability. Appellants contend that the opinion of Dr. Ross that an alternative cause was "most likely" responsible for the injuries to Julie Stinson was incompetent, since a cause which is the most likely of three alternatives may nevertheless represent less than a fifty percent possibility of occurrence. Had the alternative causes considered by Dr. Ross not included the cause espoused by appellants, this would undoubtedly be true. Such testimony regarding the "most likely" alternative cause would be incompetent not only because it lacks the degree of probability necessary for admissibility but also because it does nothing to controvert the evidence of appellants that the negligence of appellee was the probable explanation for the injuries sustained by Julie Stinson.

{¶ 18} In this regard, an expert for the defense is precluded from engaging in speculation or conjecture with respect to possible causes as is an expert who testifies for the plaintiff.

{¶ 19} The fallacy in the argument of appellants, however, is that their theory was one of the alternative causes considered by appellee's expert. Among the potential causes considered by her, another theory of causation (*e.g.*, compression of the umbilical cord) was deemed to be the most likely. Even if it had a likelihood of less than fifty percent, it had a greater likelihood than the theory espoused by appellants, in the view of the expert. The significance of the testimony, therefore, was in its ascription of likelihood not to the alternative cause but to the cause espoused by appellants. If the most likely cause among alternatives,

including the theory of appellants, has a probability of less than fifty percent, *a fortiori* appellants' theory would be even less likely. If the most likely alternative had a probability greater than fifty percent, it follows that the less likely option could not have a probability of fifty percent. As observed by this court in *Davis v. Guarnieri* (1887), 45 Ohio St. 470, 490, 15 N.E. 350, 361:

"It is legally and logically impossible for it to be probable that a fact exists, and at the same time probable that it does not exist."

{¶ 20} The testimony of Dr. Ross that another event was the most likely cause of the injuries was therefore tantamount to an opinion that the cause advanced by appellants was not the probable cause. It was therefore competent evidence which controverted a fact propounded by appellants. While the better practice would certainly have been to have the expert testimony directed to the probability of an alternative cause or the lack of probability of the causation theory advanced by appellants, we are unpersuaded that the evidence adduced by appellee was inadmissible.

II

{¶ 21} Appellants further contend that the trial court committed reversible error by permitting counsel for appellee to contradict the testimony of their expert, Dr. Warner, through resort to a medical treatise. The learned treatise exception to the hearsay rule set forth in Fed. Evid R. 803(18) has no counterpart in Ohio Evid. R. 803. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 110, 592 N.E.2d 828, 838. As stated by this court in *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 354, 41 O.O. 341, 343, 91 N.E.2d 690, 693:

"The great weight of authority holds that medical books or treatises, even though properly identified and authenticated and shown to be recognized as standard authorities on the subjects to which they relate, are not admissible in evidence to prove the truth of the statements therein contained. 20 American Jurisprudence, 816, Section 968; 65 A.L.R., 1102, annotation."

**{¶ 22}** Moreover, in *Piotrowski v. Corey Hosp.* (1961), 172 Ohio St. 61, 69, 15 O.O.2d 126, 130, 173 N.E.2d 355, 360, this court underscored the basis for the exclusion of such evidence:

"Such rule corresponds with the decided weight of authority which is to the effect that medical and other scientific treatises representing inductive reasoning are inadmissible as independent evidence of the theories and opinions therein expressed. The bases for exclusion are lack of certainty as to the validity of the opinions and conclusions set forth, the technical character of the language employed which is not understandable to the average person, the absence of an oath to substantiate the assertions made, the lack of opportunity to cross-examine the author, and the hearsay aspect of such matter."

**{¶ 23}** Accordingly, in Ohio, a learned treatise may be used for impeachment purposes to demonstrate that an expert witness is either unaware of the text or unfamiliar with its contents. Moreover, the substance of the treatise may be employed only to impeach the credibility of an expert witness who has relied upon the treatise, *Hallworth v. Republic Steel Corp*, *supra*, 153 Ohio St. at 355-356, 41 O.O. at 343-344, 91 N.E.2d at 694 or has acknowledged its authoritative nature.

**{¶ 24}** In the case at bar, appellee initially sought to establish a foundation on which to impeach the credibility of Dr. Warner by questioning his awareness of and familiarity with the textbook Williams on Obstetrics. Following his response that he was familiar with it, Dr. Warner was asked whether he considered it to be authoritative. Dr. Warner stated categorically that he did *not* consider it authoritative. Nevertheless, over objection, appellee was permitted to present portions of the text to the jury and inquire of Dr. Warner whether he agreed with the statements contained therein. Thus, instead of impeaching the credibility of Dr. Warner, appellee was permitted to contradict his testimony through the use of the contents of the text despite his earlier testimony that it was not authoritative. This

use constituted an impermissible presentation of hearsay evidence to the jury. Inasmuch as causation was strongly disputed at trial and was the basis of the jury verdict in favor of appellee, we agree with the court in *Piotrowski*, *supra*, 172 Ohio St. at 69, 15 O.O.2d at 130, 173 N.E.2d at 360, that the admission of this evidence had a substantial likelihood of affecting the jury and, thus, constituted prejudicial error. Accordingly, on this issue, the argument of appellants is well taken.

III

{¶ 25} Appellants finally contend that it was error for the trial court to strike the statements of Dr. Warner regarding disposition of his witness fees and to instruct the jury to disregard them. The trial court correctly determined that inquiry regarding the pecuniary interest of the witness in the litigation was a proper subject of cross-examination. However, on cross-examination the statement of the witness regarding the ultimate disposition of the fee was not responsive to the question. Control over the mode of interrogation of witnesses is within the sound discretion of the trial court. Evid. R. 611. Inasmuch as the answer on cross-examination was not responsive, the trial court's instruction to the jury to disregard it did not constitute an abuse of discretion. Accordingly, no reversible error was committed by the trial court with respect to this ruling.

{¶ 26} However, we reach an opposite conclusion with respect to the actions of the trial court which foreclosed further inquiry regarding the ultimate disposition of the witness fees on redirect examination. As observed earlier, the pecuniary interest of a witness in the litigation is a proper subject of cross-examination. Likewise, the lack of a pecuniary interest of the witness in the litigation is a proper subject of redirect examination. Accordingly, it is our determination that the trial court abused its discretion and committed reversible error when it foreclosed the opportunity for appellants to demonstrate that their expert did not have a pecuniary interest in the litigation.

**{¶ 27}** The judgment of the court of appeals is therefore reversed and the cause is remanded for a new trial.

*Judgment reversed*

*and cause remanded.*

MOYER, C.J., and RESNICK, J., concur.

DOUGLAS and F.E. SWEENEY, JJ., concur in the syllabus and judgment.

WRIGHT and PFEIFER, JJ., concur in part and dissent in part.

———————————

**WRIGHT, J., concurring in part and dissenting in part.**

**{¶ 28}** I agree with the majority's commentary as to the admissibility of defendant's expert's opinion. However, I must disagree with the majority's rejection of the jury's verdict on the grounds that the trial court erred during defendant's cross-examination of plaintiffs' expert witness.

**{¶ 29}** There is no doubt that the jury rejected out-of-hand plaintiffs' theory as to the proximate cause of the child's birth defect and that the rejection led to a defense verdict. Despite this finding by the jury, the majority holds that it was error to allow cross-examination of the plaintiffs' expert on certain contents of a "learned treatise" on obstetrics. The majority asserts that "Dr. Warner stated categorically that he did *not* consider [the treatise] authoritative" (emphasis *sic*) and thus concludes that cross-examination dealing with the treatise was improper and prejudicial. Entirely aside from the fact that Ohio has never adopted the learned treatise doctrine,[1] the majority simply misstates Dr. Warner's posture during trial.

———————————

1. Appellee gives an excellent review of the exception, noting in his brief to this court:

"It has long been recognized, of course, that statements contained in medical textbooks are hearsay:

"'Learned writings, such as treatises, books, and articles regarding specialized areas of knowledge or skill are, when offered to prove the truth of the matters asserted in them, clearly hearsay.' *McCormick On Evidence* (1984, 3d Edition) {321.

"Nonetheless, at least one legal commentator has long argued for their admissibility:

"'Wigmore has argued strongly for an exception for such material. In practice, he asserts, much of the testimony of experts *** consists of information they have obtained from such sources.

Warner indicated with clarity that he was well acquainted with the treatise Williams on Obstetrics. After some back-and-forth discussion to the effect that Dr. Warner did not use any textbooks in his teaching and that he rejected the treatise as a whole, the record reflects the illuminating discourse that follows:

"Q. Well, I think you have testified previously that you considered *Williams on Obstetrics* part authoritative and part non authoritative, is that right?

"A. That's right. There are parts of it that are not authoritative and there are parts that are. I don't consider it an authoritative text book."

**{¶ 30}** Thus, as anyone can see, Dr. Warren considered the treatise to be authoritative in part. Certainly counsel should be allowed to quote the treatise in part to determine what part Dr. Warner agreed with and what part he did not accept. How in the name of sense can this line of questioning be determined to be reversible, prejudicial error?

---

*** Moreover, he suggests there are sufficient assurances of trustworthiness to justify equating a learned treatise with a personally-testifying expert. Not only does the author have no bias in any particular case, but it is likely that he was motivated in writing the treatise by a strong desire to state accurately the full truth.' *Id.*, citing 6 *Wigmore*, Evidence {{1690-1709 (Chadbourne Rev. 1976).

"Federal Rule of Evidence 803(18), therefore, provides for a general exception to the hearsay rule for learned treatises, although it does not allow them to be made exhibits for the jury's consideration:

"'The following are not excluded by the hearsay rule ***:

"'To the extent called to the attention of an expert witness upon cross-examination *or relied upon during direct examination*, statements contained in published treatises. *** If admitted, the statements may be read into evidence but may not be received as exhibits.'

"Twenty (20) states have adopted identical versions of Federal Rule of Evidence 803(13). Another three states, Nevada, South Dakota and Wisconsin, have adopted rules identical in substance to Federal Rule of Evidence 803(18), although they employ slightly different phraseology. Two more states, Colorado and Idaho, have rules using identical language regarding the general exception of learned treatises from the hearsay rule, but also allow the articles to be admitted as exhibits, or taken into the jury room. Kansas also allows learned treatises to be used as direct evidence, but makes no provision regarding whether the articles may be introduced as exhibits or taken to the jury room. Louisiana allows the use of learned treatises as direct evidence, but only in civil cases, and provides that although the treatise may be made an exhibit, it may not be taken to the jury room. Massachusetts, on the other hand, allows the use of learned treatises as direct evidence, but only in medical negligence cases. Finally, Alabama, Connecticut and New Jersey have case-law allowing the use of learned treatises to be used [*sic*] as *direct* evidence. Thus, thirty-one (31) states, by rule, statute, or case-law allow the use of learned treatises as direct evidence." (Emphasis *sic* and footnotes omitted.)

**{¶ 31}** As noted above, Ohio has not yet accepted the "learned treatise" exception for the introduction of evidence. However, we have recognized that it is within the discretion of the trial court to permit cross-examination of, and testimony on, an expert's familiarity with opinions expressed in various texts and medical literature, regardless of whether the witness relied on such sources. See *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 17 O.O.3d 98, 407 N.E.2d 490. In my view it is preposterous to limit this sort of examination, as that would make it nigh on to impossible to test the witness's knowledge or his or her familiarity with the subject matter at hand.

**{¶ 32}** Further, there is a second problem stated by the court of appeals as follows: "There is a broader and [more] troubling question raised by appellants. Must the trial court deny the right of cross-examination of an expert medical witness because such expert does not consider a medical textbook as totally right ***?" Can an expert simply say that all books and medical journals are not authoritative? As stated by the court of appeals, "[i]f this be the law, a medical expert has it in his power to deny the right of cross-examination." I suggest that the affirmative answer to this question, which the majority appears to adopt today, is an unfortunate and unwarranted aberration. For the reasons stated, I would affirm the court of appeals and reject any claim of error by the trial court.

PFEIFER, J., concurs in the foregoing opinion.

_____