JOURNAL ENTRY AND OPINION
This is an appeal from a jury verdict following a trial before Judge Shirley Strickland Saffold. Appellant Dillard Department Stores, Inc., (Dillard) a self-insured employer, appealed to the common pleas court from an order of the Industrial Commission allowing appellee Nancy Smith to claim right leg dystonia as part of her 1992 work-related ankle injury. It claims that the judge erred by allowing Smith's medical expert to testify about medical opinions contained within her hospital records. Additionally, it asserts error in denying its motion for summary judgment which challenged the expert's reliability requirement under Evid.R. 702(C) and because the expert could not relate the ankle injury and the dystonia within a reasonable degree of medical certainty. We disagree and affirm the judgment.
On February 14, 1992, Dillard hired Smith for the position of manager of the Chanel cosmetics counter in its Westgate Mall store in Rocky River, Ohio. On June 3, 1992, while returning from her dinner break, Smith caught her leg on the corner of a key rack and fell. The following day, she visited the emergency room of a local hospital where a cast was placed on her right leg and, thereafter, the ankle and leg condition worsened.
In an order dated September 9, 1992, the Industrial Commission recognized her claim for sprain right ankle, tendinitis, and reflex sympathetic dystrophy (RSD). This condition required Smith to undergo surgery on her ankle, and eventually she developed a progressive deformity and dysfunction of her lower leg, known as dystonia. Due to this condition, Smith has an unusual gait and is unable to walk on the heel of her foot. Any attempt to force her heel to the ground causes her leg to rotate at the hip and her right kneecap to face her left leg. She also cannot simultaneously straighten both of her legs.
Smith's physicians opined that the dystonia developed as a direct result of her original ankle injury and, on September 9, 1996, she filed a motion with the Commission seeking an additional allowance for dystonia. A hearing officer denied the application on October 29, 1996 and, after appeal, a staff hearing officer granted the additional allowance on November 22, 1996. Dillard sought further review, but on January 6, 1997 the Commission refused to hear the appeal.
On March 13, 1997, pursuant to R.C. 4123.512, Dillard then filed its notice of appeal with the court of common pleas. Smith filed her complaint on April 8, 1997 but dismissed the action pursuant to Civ.R. 41(A) on April 15, 1998. She re-filed her complaint on May 29, 1998 and the action proceeded to trial.
The testimony of Dr. David M. Riley, a University Hospital neurologist who treated Smith, was presented through video tape deposition. He stated that he first saw Smith on July 10, 1996 upon referral from Dr. Thomas Chelimsky, an autonomic nervous system expert, and Dr. Bashar Katirji, both who thought she might suffer from dystonia. In an internal letter from Dr. Chelimsky to Dr. John Wilber, an orthopaedic surgeon, dated May 5, 1995, Dr. Chelimsky indicated that treatment had been unsuccessful, that the cause of Smith's problem was unknown, and that he felt Smith should see Dr. Riley to clarify the issue.
Reading from a November 30, 1995 letter by Dr. Angela Smith, a specialist in pediatric orthopaedics, to Dr. Wilber (as copied to Dr. Chelimsky), Dr. Riley described Smith's dystonic gait :
 She walks with her heel approximately two inches off the floor with her entire right lower extremity turned inward markedly and hikes her right hip. She also throws her trunk over to the right side in stance phase apparently for balance. When she attempts to put her heel down onto the ground actively her right hip rotates immediately to its full extent. The hip protrudes laterally markedly making her overall coronal plane alignment even worse and her shoulders rotate in a compensatory manner.
Dr. Riley also gave a similar description of Smith's gait, indicating that [t]here is no point at which she can assume a normal posture with the leg, even when she is standing still. When she walks, she has a choice of keeping her hip straight or keeping her foot straight * * *. If she compensates in one way, he continued, she pays the price in another way * * *.
Dr. Riley explained that dystonia is an abnormal, painful movement caused by sustained contractions of muscles which usually results in abnormal postures. Theoretically, dystonia can affect any part of the body and can be limited in scope or involve the whole musculature of the body. He explained that there are many causes of dystonia and, in some instances, a definite cause cannot be found. There are two broad categories of dystonia: (1) the inherited types; and (2) the acquired types, or secondary dystonia brought on by diseases of the nervous system. As documented in medical literature and case studies, secondary dystonia may be caused in literally over a hundred different ways, including trauma. Additionally, it can be classified as organic, resulting from a disease of the brain, and psychogenic, resulting from psychological factors.
While Dr. Riley admitted that, because of the complexity of the brain, the experts don't know exactly how to explain peripheral trauma causing dystonia, * * * [the same is] true of dystonia of any cause or, for that matter, all kinds of nervous system diseases. As an example he explained that, even though neurologists could not explain why certain neurological symptoms develop as a result of a stroke, they can assume that the symptoms that develop following the stroke are related to the stroke. With dystonia, there is no objective measurement that can document whether a person has it. Riley agreed the condition is more commonly associated with central nervous system injury rather than peripheral nervous system injury and that idiopathic dystonia, one of unknown origin, is also more common than peripheral dystonia.
In Smith's case, Riley described the trauma to her foot as significant because, shortly after the injury she developed an abnormal posturing of that leg when she walked, and she never regained normal function of her foot. Dr. Wilber had performed a peroneal tendon surgery in November 1992, but Riley indicated that the dystonia continued to develop thereafter. He concluded that Smith exhibited symptoms indicating organic dystonia induced by trauma rather than psychogenic dystonia but agreed that if Smith's dystonia were psychogenic in origin rather than traumatic, it could not be related to her employment at Dillard's. According to Dr. Riley, Dr. Chelimsky referred Smith to him but also to Dr. Jeff Janata, a psychologist, for a psychological evaluation. Dr. Riley stated that, in Janata's report to Chelimsky, Janata concluded that Smith did not have a psychological state that would predispose her to psychogenic dystonia.
Because Dr. Chelimsky had previously diagnosed and the Bureau of Workers' Compensation had recognized that Smith also suffered from RSD, Dr. Riley explained that a large number of people with RSD also suffered from dystonia: The two can co-exist and indeed seem to occur more frequently than would be expected by pure chance.
Dr. Riley treated Smith with botulinum toxin, a chemical that paralyzes the muscle, abolishes involuntary muscle spasms, and helps reduce the pain associated with those spasms for a three-to four-month period. After her second treatment, Smith told him that she was able to sleep for the first time in five years. While the injections helped relieve the pain, however, it did not improve her leg posture.
Dr. Riley admitted that he had not reviewed Smith's chart immediately before his deposition was taken nor had he brought it with him, but he pointed out that Smith's other doctors had also suspected or diagnosed her with dystonia. He discussed a May 2, 1996 report from Dr. Katirji that raised the possibility that Smith suffered from secondary dystonia and suggested that a consultation with Dr. Riley, who's a movement disorder specialist, might shed some light on Smith's condition. In addition, Riley quoted from Dr. Wilber's November 19, 1996 general letter:
 `It was both Dr. Katirji's and Dr. Riley's assessment that Nancy Smith has dystonia of her lower extremity and they both feel this is directly related to her original traumatic injury of [6/3/92]. I feel there is a clear consensus by multiple experts in both [P]ediatric [O]rthopedic [S]urgery and [N]eurology that Nancy Smith has dystonia which is directly caused by her work related injury of [6/3/92.]'
Finally, Riley read Dr. Wilber's January 27, 1998 notation in Smith's chart which indicated that he strongly agreed with Riley's diagnosis.
Dillard's expert, Dr. John Conomy, concluded that Smith's dystonia could have been caused by peripheral trauma but did not believe that it was probable.
Six of the eight jurors returned a verdict in favor of Smith, finding that she could participate in the workers' compensation fund for dystonia, and that judgment was journalized.
Dillard's first assignment of error states:
 I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN PERMITTING HEARSAY AND DOUBLE HEARSAY EVIDENCE CONCERNING MEDICAL OPINIONS OFFERED TO PROVE THE ULTIMATE ISSUE AT TRIAL.
Dillard's contends that much of Dr. Riley's testimony was hearsay and double hearsay opinion statements of Smith's other physicians contained with her University Hospitals chart. While it acknowledges that R.C.2317.40 and Evid.R. 803(6) allow the use of medical charts as evidence after qualification as a business record, it contends that opinions contained within the chart are not admissible. Smith counters, arguing that testimony regarding out-of-court medical opinions and diagnoses is admissible under Evid.R. 803(6).
Contrary to Dillard's assertion, and recent conclusions of other courts of this state,[1] Evid.R. 803(6) does not preclude the admissibility of opinions or diagnoses contained in medical records or reports as long as they satisfy the foundational and authentication requirements of Evid.R. 803(6)[2] and do not violate other evidentiary rules (e.g., R.C.2317.02(B); Evid.R. 402 and Evid.R. 702).[3]
Before the adoption of Evid.R. 803(6) in 1980, Ohio courts looked to and applied the business records hearsay exception codified in The Uniform Business Records as Evidence Act, as adopted by this state in 1939, Gen. Code, § 12102-22 et seq. Currently found at R.C. 2317.40, it provides, in pertinent part, as follows:
 As used in this section "business" includes every kind of business, profession, occupation, calling, or operation of institutions, whether carried on for profit or not.
 A record of an act, condition, or event, in so far as relevant, is competent evidence if the custodian or the person who made such record or under whose supervision such record was made testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission. [Emphasis added.]
In 1947, while discussing the statute as it applies to medical records, the Supreme Court noted in Weis v. Weis, 147 Ohio St. 416, 425,72 N.E.2d 245, that the purpose of the statute was to liberalize and broaden the shop-book rule, recognized at common law as an exception to the general rule excluding hearsay evidence, and to permit the admissions of records regularly kept in the course of business and incident thereto * * *. The Supreme Court explained the basis for this exception to the hearsay rule:
 The exception to the hearsay rule of evidence in such cases is based on the assumption that the records, made in the regular course of business by those who have a competent knowledge of the facts recorded and a self-interest to be served through the accuracy of the entries made and kept with knowledge that they will be relied upon in a systematic conduct of such business, are accurate and trustworthy. In other words, such records are accepted as accurate and trustworthy, until inaccuracy is shown, upon faith in the routine by which and in the purpose for which they are made. Globe Indemnity Co. v. Reinhart, [152 Md., 439, 446, 447, 137 A., 43]. Of course, if it should appear that such records have been made and kept solely for a self-serving purpose of the party offering them in evidence, it would be the duty of a trial court to refuse to admit them. Hoffman v. Palmer, 2 Cir., 129 F.2d 976; Needle v. New York Railways Corporation, 227 App. Div. 276, 278, 279, 237 N.Y.S. 547, 549; Conner v. Seattle, Renton So. Ry. Co., 56 Wn. 310, 105 p. 634, 25 L.R.A., N.S., 930, 134 Am.St.Rep. 1110.
Weis, 147 Ohio St. at 425-426. [A]s applied to hospital records, [the statute also] * * * avoid[s] the necessity and thereby the expense, inconvenience and sometimes the impossibility of calling as witnesses the attendants, nurses and physicians who have collaborated to make the hospital record of a new patient. Id. at 425.
 [T]hose portions of hospital records made in the regular course of business and pertaining to the business of hospitalization and recording observable acts, transactions, occurrences or events incident to the treatment of a patient are admissible, in the absence of privilege, as evidence of the facts therein recorded, insofar as such records are helpful to an understanding of the medical or surgical aspects of the case, and insofar as relevant to the issues involved, provided such records have been prepared, identified and authenticated in the manner specified in the statute itself. [Weis, 147 Ohio St. at 424.]
The Supreme Court further explained that a hospital or physician's office record may properly include the patient's case history; a diagnosis by one qualified to make it; and the condition and treatment of the patient covering such items as temperature, pulse, respiration, symptoms, food and medicines given, analysis of the tissues or fluids of the body[,] and the behavior of and complaints made by the patient. Id. at 425.
In 1974, the Tenth District Court of Appeals addressed the act in the context of the admissibility of a medical report in letter form, from a physician to whom the attending physician had referred his patient for an unrelated malady, that was found in the attending physician's records. In Hytha v. Schwendeman (1974), 40 Ohio App.2d 478, 320 N.E.2d 312, that court held that a medical diagnosis, made by a qualified physician and contained in an otherwise duly authenticated record, is admissible if that statement falls within the general principle of the law of evidence, where such a diagnosis would be admissible if testified to in open court by the person who made the record. 40 Ohio App.2d at 483. Citing its opinion in Dillon v. Young (1965), 3 Ohio App.2d 110, 113,209 N.E.2d 623, 625, reversed upon other grounds in 6 Ohio St.2d 221,217 N.E.2d 868, it noted that [a]s to the inclusion of expert opinion generally, within a business record, * * * `we think it clear that a record of an opinion by a qualified expert as to a matter upon which opinion evidence is proper is also admissible.' Hytha,40 Ohio App.2d at 482-483.[4] It further explained, however, that [i]t is over simplistic to state that a diagnostic finding can, or cannot be admissible as a part of the business records of a hospital, or of a physician. Id. at 483.
 [W]e feel that the overriding consideration is that such diagnosis must be contained either in the records of a hospital, in which records the diagnosis is a systematic entry made in the regular course of the business of the hospital, or the diagnosis must have been entered within the records of the physician making such diagnosis and the diagnosis must be shown to have been entered, and the record kept, within the regular course of the business of the physician. [Id.]
The court concluded that the letter from the second physician, which contained diagnostic findings and opinions about the patient's psychological condition, was not a record of the receiving doctor within the purview of R.C. 2317.40.[5] [S]uch a record, in order to constitute a business record and be admissible to prove the truth of the matter asserted, must be that of the physician making the diagnosis and be shown to have been made in the regular course of the business of such doctor. Id. at 486. The court further explained that, even where a hospital record or physician's office record is properly qualified and found to be generally relevant to the issues, this does not necessarily render all parts of the record admissible. Id. at 487. The court noted that the letter was not made in the regular course of business of the attending physician and that, even if it had been otherwise qualified, portions of the letter contained statements that were not based upon observable data and, as such, were not admissible. Id. at 486-487.
In the syllabus of the Hytha opinion, the court provided the following guide to determine admissibility under R.C. 2317.40:
 Before the record of a medical diagnosis made by a physician may be admitted into evidence, pursuant to R.C. 2317.40 (Records, as evidence), the following factors must be present:
 (1) The record must have been a systematic entry kept in the records of the hospital or physician and made in the regular course of business;
 (2) The diagnosis must have been the result of well-known and accepted objective testing and examining practices and procedures which are not of such a technical nature as to require cross-examination;
 (3) The diagnosis must not have rested solely upon the subjective complaints of the patient;
 (4) The diagnosis must have been made by a qualified person;
 (5) The evidence sought to be introduced must be competent and relevant;
 (6) If the use of the record is for the purpose of proving the truth of matter asserted at trial, it must be the product of the party seeking its admission;
(7) It must be properly authenticated.[6]
The adoption of the Uniform Business Records as Evidence Act, R.C.2317.40, followed the adoption in 1936 of the similarly worded Commonwealth Fund Act, ch. 640, § 1, 49 Stat. 1561 (1936) (codified as amended at 28 U.S.C. § 1732).[7] The intent of the Commonwealth Fund Act and attendant common-law rules next found their expression in Fed.R.Evid. 803(6). In 1980, after the 1975 adoption of the Federal Rules of Evidence, the Supreme Court of Ohio adopted its version of Fed.R.Evid. 803(6).[8] Like Fed.R.Evid. 803(6), Evid.R. 803(6) does not exclude records of regularly conducted business activity on the basis of hearsay, even though the declarant is available as a witness:
 A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. [Emphasis added.]
Like R.C. 2317.40, the court rule retained the words acts, events, and conditions of the business record hearsay exception but it did not expound upon that list to include the terms diagnosis and opinions as incorporated into the federal rule.[9] A review of the staff notes accompanying both the Ohio and federal rule helps explain the reason for the omission.
The 1980 staff notes accompanying Evid.R. 803(6) pointed out the opinions or diagnoses discrepancy with the federal rule:
 The Ohio rule departs from the Federal Evidence Rule by deleting "opinions and diagnoses" as admissible under this section. It is not clear how far present Ohio law permits such evidence to be admitted. In Hytha v. Schwendeman (1974), 40 Ohio App.2d 478, 69 O.O.2d 419, 320 N.E.2d 312, the Franklin County Court of Appeals set forth seven criteria for a diagnosis to be admissible when contained in a hospital record. The Hytha case may retain validity in so far as it may assist in determining the point at which, in medical records, an act, event or condition admissible under the exception becomes an impermissible opinion or diagnosis under the rule.
Interestingly, and in contrast to the Ohio 1980 staff notes, the 1972 advisory committee notes accompanying the federal rule cite Weis as authority for including the opinions or diagnoses phrase in the rule:
 Entries in the form of opinions were not encountered in traditional business records in view of the purely factual nature of the items recorded, but they are now commonly encountered with respect to medical diagnoses, prognoses, and test results, as well as occasionally in other areas. The Commonwealth Fund Act provided only for records of an "act, transaction, occurrence, or event," while the Uniform Act, Model Code Rule 514, and Uniform Rule 63(13) merely added the ambiguous term "condition." The limited phrasing of the Commonwealth Fund Act, 28 U.S.C. § 1732, may account for the reluctance of some federal decisions to admit diagnostic entries. New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297
(1945); Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067; England v. United States, 174 F.2d 466 (5th Cir. 1949); Skogen v. Dow Chemical Co., 375 F.2d 692 (8th Cir. 1967). Other federal decisions, however, experienced no difficulty in freely admitting diagnostic entries. Reed v. Order of United Commercial Travelers, 123 F.2d 252 (2d Cir. 1941); Buckminster's Estate v. Commissioner of Internal Revenue, 147 F.2d 331 (2d Cir. 1944); Medina v. Erickson, 226 F.2d 475 (9th Cir. 1955); Thomas v. Hogan, 308 F.2d 355 (4th Cir. 1962); Glawe v. Rulon, 284 F.2d 495 (8th Cir. 1960). In the state courts, the trend favors admissibility. Borucki v. MacKenzie Bros. Co., 125 Conn. 92, 3 A.2d 224 (1938); Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 55 A.L.R.2d 1022 (1956); People v. Kohlmeyer, 284 N.Y. 366, 31 N.E.2d 490 (1940); Weis v. Weis, 147 Ohio St. 416, 72 N.E.2d 245 (1947). In order to make clear its adherence to the latter position, the rule specifically includes both diagnoses and opinions, in addition to acts, events, and conditions, as proper subjects of admissible entries.
Given the language of the federal advisory committee notes, Ohio courts should not construe the omission of the words opinions and diagnoses in the Ohio rule as indicative of an intent to change the principles of Ohio common law. Because the federal rule setting forth the hearsay exception regarding records of regularly conducted business activity was adopted, at least in part, to reflect the common law of this state, we cannot say that the omission of the words opinion and diagnoses in Evid.R. 803(6) reflects an intent to preclude the admissibility of an otherwise qualified medical report or record under that exception merely because the report or record contains out-of-court opinions or diagnoses. Moreover, to have included the words opinions and diagnoses within the text of Evid.R. 803(6) would have been redundant of the case law applying R.C. 2317.40. As Evid.R. 102 (as amended eff. July 1, 1996), makes clear, [t]he principles of the common law of Ohio shall supplement the provisions of these rules, and the rules shall be construed to state the principles of the common law of Ohio unless the rule clearly indicates that change is intended. [Emphasis added.][10] Based upon Evid.R. 102, and considering both the case law interpreting R.C. 2317.40 rendered before the inception of Evid.R. 803(6) and the similarity in wording of both R.C. 2317.40 and Evid.R. 803(6), together with the intent of Fed.R.Evid. 803(6), it is clear that opinions and diagnoses contained within medical reports or records fall within the business records hearsay exception of Evid.R. 803(6). As such, the rules announced in Weis and Hytha supplement Evid.R. 803(6) to the extent they: (1) apply to the admissibility of medical records and their contents; and (2) have not been otherwise superceded by other evidentiary rules.[11]
In the present matter, while Dillard's contends that introducing these records, as such, precluded it from challenging whether the expert rendering a particular opinion was qualified to give a diagnosis, see Lambert, 79 Ohio App.3d at 24, citing Dillow v. Young (1965),3 Ohio App.2d 110, 115, 209 N.E.2d 623, 627, reversed on other grounds (1966), 6 Ohio St.2d 221, 217 N.E.2d 868, it did not object at trial or challenge the admission of the opinions upon that basis. As such, a review of such alleged error is not properly before this court for its review. Evid.R. 103(A)(1). In addition, Dillard's did not, nor does it now, challenge the admissibility of the opinions based upon a foundational or authentication basis but, then as now, argues here that the various doctors' opinions contained in the reports and testified to by Dr. Riley are not admissible under the Evid.R. 803(6) business records hearsay exception for the sole reason that they are opinions or diagnoses. As our discussion indicates, out-of-court medical opinions or diagnoses contained within an otherwise authenticated medical report or record that satisfies the foundational requirements of Evid.R. 803(6) comes within the ambit of the business record hearsay exception contained in that rule and is admissible unless the opinions or diagnoses violate other evidentiary rules. Accord Weis, 147 Ohio St. at 424-425; Hytha,40 Ohio App.2d at 482-483. We cannot conclude that it was prejudicial error to allow their introduction into evidence, and we overrule the first assignment of error.
The second assignment of error states:
 II. THE COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR SUMMARY JUDGMENT WHERE PLAINTIFF'S EXPERT TESTIMONY WAS NOT SCIENTIFICALLY RELIABLE AS A MATTER OF LAW.
Dillard's pre-trial motion challenged Dr. Riley's qualifications as an expert because his deposition testimony revealed that no one can explain why dystonia occurs or why peripheral trauma would cause such an order and, therefore, his opinion as to the cause of Smith's problems was mere speculation. It points out that Dr. Riley admitted that there is no objective test to determine whether the manifestation of dystonia is traumatic, psychological, or voluntary, and that learned articles relied upon by Dr. Riley and the testimony of Dr. Conomy, its expert, confirmed that the scientific community cannot reliably causally relate peripheral trauma to dystonia. Therefore, it submits, his testimony was not reliable under Evid.R. 702 and should not have been admitted.
Smith responds that Dillard's bases its argument on the fact that Dr. Conomy's testimony was in conflict with that of Dr. Riley, but the mere fact that the experts disagree does not mean that Dr. Riley's testimony was unreliable.
We agree with Smith. Evid.R. 702 provides as follows:
 A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result. [Emphasis added.]
Dillard's does not contest Dr. Riley's status as an expert or his testimony as it related to matters beyond the knowledge or experience possessed by lay persons, only the reliability of his opinion under division (C).
When determining whether an expert's testimony is admissible under Evid.R. 702(C), the judge must focus upon reliability, i.e., whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof * * *. Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607, 687 N.E.2d 735, paragraph one of the syllabus. When evaluating the reliability of scientific evidence, a judge considers several factors: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. Id. at 611, citing Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579, 593-594, 113 S.Ct. 2786,2797, 125 L.Ed.2d 469. Not one of these factors, however, is a determinative prerequisite to admissibility. State v. Nemeth (1998),82 Ohio St.3d 202, 211, 694 N.E.2d 1332. In addition, [t]he reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth. Id. Further, when reviewing a summary judgment motion, a trial court should not reject one expert opinion or another simply because it believes one theory over the other. Miller, 80 Ohio St.3d at 613-614.
It is clear from Dillard's argument that it has mistaken an Evid.R. 702(C) challenge to the reliability of evidence with a challenge to the weight of the evidence that tends to show the causal relationship between Smith's dystonia and the June 3, 1992 injury. It does not contest that: (1) dystonia is a recognized disease that may result from peripheral trauma or that; (2) various doctors diagnosed Smith with the disease; or (3) the methodology or means of reaching Smith's diagnosis of dystonia. See Miller, 80 Ohio St.3d at 611. It claims only that the scientific community cannot explain howor whyperipheral trauma may result in dystonia. Such a challenge goes to the weight of the evidence rather than the reliability of the evidence determining cause and effect. A judge may not consider the weight of the evidence in ruling upon a motion for summary judgment but only whether there exists a genuine issue of material fact. Sterling v. Penn Traffic Co. (1998), 129 Ohio App.3d 809,812, 719 N.E.2d 82 (The issue presented by a motion for summary judgment is not the weight of the evidence, but whether there is sufficient evidence of the character and quality set forth in Civ.R. 56 to show the existence or nonexistence of genuine issues of fact.); see Miller,80 Ohio St.3d at 613. Therefore, we cannot say that the judge erred in denying Dillard's motion for summary judgment on this basis, and we overrule its second assignment of error.
In its third assignment of error, Dillard's again challenges the denial of its motion for summary judgment:
 III. [THE] TRIAL COURT ERRED IN DENYING [DILLARD'S] MOTION FOR SUMMARY JUDGMENT WHEN PLAINTIFF'S EXPERT TESTIMONY WAS INADMISSIBLE AS A MATTER OF LAW DUE TO [THE] EXPERT'S FAILURE TO OPINE IN TERMS OF PROBABILITY CONCERNING THE CAUSE OF PLAINTIFF'S DYSTONIA.
Dillard's argues, as a matter of law, that Dr. Riley's testimony was incompetent for admission at trial because he failed to express a causal relationship between the work injury and dystonia in terms of medical probability. Smith contends that Dillards misrepresents the record.
To be admissible, an expert's opinion regarding the proximate cause of an event must be expressed in terms of probability. Stinson v. England (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph one of the syllabus. An event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue. Id. The expert's testimony need not include the magic words probability or certainty but, when reviewed in its entirety, it must be equivalent to an expression of probability. Schroeder v. Parker (Dec. 10, 1998), Cuyahoga App. No. 73907, unreported. Because the expression of probability is a condition precedent to the admissibility of expert opinion regarding causation, it relates to the competence of the evidence and not its weight. Stinson, supra.
To support its argument, Dillard's points to Dr. Riley's following deposition testimony elicited in response to its question:
 Q: Doctor, based on your opinion just given here, would you be able to say with any reasonable degree of medical certainty whether or not the cause of this condition is either organic or psychogenic?
A: I couldn't say with any certainty.
Stinson, however, does not require medical certainty to support the admissibility of expert opinion regarding causation. The record reveals, and Dillard's acknowledged in its brief, that Dr. Riley maintained during his deposition that, based upon a medical probability, Smith suffered from an organically based, posttraumatic dystonia. We find no merit to Dillard's argument and overrule the third assignment of error.
Judgment affirmed.
It is ordered that the appellee recover from appellant her costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, J., REGARDING ASSIGNMENT OF ERROR ONE, CONCURS IN JUDGMENT ONLY; CONCURS COMPLETELY WITH THE REMAINDER OF THE MAJORITY OPINION;
TERRENCE O'DONNELL, P.J., DISSENTS (SEE DISSENTING OPINION ATTACHED TO JOURNAL ENTRY).
[1] Meyers v. Hot Bagels Factory, Inc. (1999), 131 Ohio App.3d 82,101, 721 N.E.2d 1068 ([T]he report contains a diagnosis, and Evid.R. 803(6) does not allow for opinions and diagnoses found in business records to be admitted into evidence.); Bush v. Burchett (June 13, 1995), Athens App. No. 94CA2237, unreported (both the plain language to Evid.R. 803(6) and the Staff Note make it clear Ohio does not provide an exception to the hearsay rule for that out-of-court medical opinions or diagnoses). We also reject the dicta in Cater v. Cleveland (May 8, 1997), Cuyahoga App. No. 70674, unreported, reversed and remanded on other grounds, 83 Ohio St.3d 24, where the writing judge concluded, with whom the two remaining judges concurred in judgment only, that unlike its federal counterpart, Ohio's Evid.R. 803(6) does not provide an exception to the hearsay rule for out-of-court medical opinions or diagnoses.
[2] The proponent of the evidence, or the parties must stipulate, that (1) the records were made at or near the time of the event, (2) the records were kept in the ordinary course of business, and (3) the records were made by a person with knowledge. We believe, however, that when a party desires to make an authenticity stipulation solely for Evid.R. 901 purposes and not for Evid.R. 803(6) purposes, the party must explicitly bring to the court's attention the limited nature of the stipulation. Lambert v. Goodyear Tire Rubber Co (1992), 79 Ohio App.3d 15, 27,606 N.E.2d 983; see Quiller v. Mayfield (Aug. 17, 1989), Franklin App. No. 88AP-1115, unreported.
[3] E.g., Hunt v. Mayfield (1989), 65 Ohio App.3d 349, 354,583 N.E.2d 1349.
[4] The text of the Hytha opinion uses the terms diagnosis and opinion interchangeably.
[5] Williams v. Mayfield (Nov. 29, 1990), Franklin App. No. 90AP-144, unreported; see, also, State ex rel. Shumway v. State Teachers Retirement Bd. (1996), 114 Ohio App.3d 280, 288, 683 N.E.2d 70 (The information received from outside sources is not part of STRS business records for purposes of Evid.R. 803(6), since the information from outside sources was not properly authenticated.). But cf. Pearson v. Wasell (1998),131 Ohio App.3d 700, 707, 723 N.E.2d 609 (Seventh District Court of Appeals, Columbiana County, concluded that the attending physician could testify regarding the contents of a letter from the referring physician which expressed an opinion about plaintiff's motivation for the lawsuit because the letter satisfied the admissibility requirements of Evid.R. 803(6)).
[6] Pursuant to Rep.R. 2(F), [t]he syllabus of a Court of Appeals opinion shall not be considered the controlling statement of either the point or points of law decided, or law of the case, but rather as a summary for the convenience of the public and the Bar * * *. [T]he point or points of law decided in the case are contained within the text of the opinion, and are those necessarily arising from the facts of the specific case before the court for adjudication. See Lambert,79 Ohio App.3d at 23.
[7] With the adoption of the Fed.R.Evid. 803(6) (eff. July 1, 1975), Congress made substantial changes to the statute in 1975. Jan. 2, 1975, P. L. 93-595, § 2(b), 88 Stat. 1949. The statute now addresses the admissibility of copies of business records.
[8] 62 Ohio St.2d xxxi, xlv (eff. July 1, 1980).
[9] Fed.R.Evid. 803(6) differs slightly, because it includes opinions and diagnoses in its list of potentially admissible content: A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time * * * are admissible * * *. It also does not include reference to the corresponding Fed.R.Evid. 901(b)(10).
[10] Evid.R. 102, Staff Notes (1996) provides the background for this rule:
 As originally adopted, Evid. R. 102 referred to the common law of Ohio, but only as a framework for construing the particular rules within the Rules of Evidence. The original text of Rule 102 did not suggest what role, if any, the common law was to have in regard to evidentiary issues as to which the Rules of Evidence were silent.
 In the years since Ohio adopted the Rules of Evidence, Ohio has added rules codifying the common law on certain topics that the Rules had not addressed. * * * The Rules of Evidence * * * are not an exhaustive compilation of the rules governing evidence questions, nor are the rules preemptive as to subjects that they do not address. The amendment makes clear in the text of the rule not only that the common law of Ohio provides a framework for construing the content of specific rules, but also that the common law provides the rules of decision as to questions not addressed by specific rules.
See, also, Mastran v. Urichich (1988), 37 Ohio St.3d 44, 48-49,523 N.E.2d 509.
[11] The Hamilton County Court of Appeals recently addressed both R.C.2317.40 and Evid.R. 803(6) in the context of a medical report prepared at the request of the plaintiff's attorney. Meyers, 131 Ohio App.3d at 101. The court found the report inadmissible, holding that Evid.R. 803(6) does not allow for opinions and diagnosis found in business records to be admitted into evidence. It also concluded that report was inadmissible under R.C. 2317.40 because no foundation was laid to show that the summary constituted a systematic entry made in the regular course of [the doctor's] business. As such, Meyers, draws a distinction between the admissibility of opinions and diagnoses under R.C. 2317.40 and Evid.R. 803(6)). See, also, supra note 1 and accompanying text.