OPINION
{¶ 1} Appellant, Tammie Knapp, appeals from the Portage County Common Pleas Court's decision to overrule her motion for directed verdict.
 {¶ 2} Appellee, Dr. Alan Rosenwasser, provided prenatal care for appellant, Tammie Knapp during her third pregnancy. After several out-patient observation admissions to assess whether appellant was going into early labor, she was admitted to Robinson Memorial Hospital at approximately 2:20 a.m. on September 28, 1998 for labor and delivery of her son, James Knapp. Appellant labored with difficulty, and cervical dilation was not complete until 11:10 p.m. Dr. Rosenwasser ordered a caesarian section team and a "code pink" team into the delivery room in the event either was needed. After approximately twenty minutes of pushing, and with the assistance of a vacuum extractor, Dr. Rosenwasser delivered James' head. At this point, Dr. Rosenwasser noticed the infant had a medical complication known as shoulder dystocia.
 {¶ 3} Shoulder dystocia is an emergency obstetrical complication. It occurs when a baby's head is delivered by vertex presentation (head first), but the rest of the body does not follow because the anterior shoulder is impacted against the mother's symphysis pubis (pubic bone). Shoulder dystocia occurs in approximately one in every one hundred to one hundred fifty deliveries.
 {¶ 4} Upon encountering the shoulder dystocia, there was expert testimony that Dr. Rosenwasser employed specific, medically accepted obstetrical maneuvers designed to facilitate the delivery of the infant. He then applied traction in interest of delivering the infant's anterior shoulder. Traction is a form of downward force an obstetrician employs to guide the baby down through the birth canal. Excessive traction is inappropriate during a shoulder dystocia delivery because it may result in stretching and a possible rupture (separation or cleavage of a nerve) or avulsion (the tearing loose of a nerve from its exit point in the spine) to the brachial plexus nerves.
 {¶ 5} The brachial plexus is a group of five nerves that emerge in the cervico-thoracic region. Four of the nerves originate in the cervical spine and one emanates from the upper part of the thoracic spine. These five nerves branch from the spinal column and form a group which effectively controls the function of the arm, shoulder, wrist, fingers, and thumb.
 {¶ 6} Upon delivery, the infant was unconscious. He was immediately handed to the "code pink" team, resuscitated, and stabilized. After resuscitation, it was noted that James had a right side brachial plexus injury and a fractured left humerus bone. He was transferred to Children Hospital Center of Akron, Ohio where he was diagnosed with a right brachial plexus injury. In particular, James sustained multiple ruptures of the nerves within his brachial plexus. The infant subsequently received surgical treatment for his injuries at Texas Children's Hospital in Houston, Texas in April of 1999. As to date, James has recovered limited function of his right arm. To wit, James has virtually no function of his deltoid muscle, he cannot reach his mouth with his right hand, he cannot use his right hand to pick up an object, and can only hold an object such as an ink pen or pencil if it is placed into his hand. It is undisputed that James' injuries are permanent.
 {¶ 7} On February 4, 2000, appellant filed a complaint against appellees Alan L. Rosenwasser, M.D. and Robert W. Egdell, M.D. On December 10, 2001, Dr. Edell was dismissed from the case. Appellant's complaint alleged that appellee committed medical malpractice during the prenatal care, labor, and subsequent delivery of James Knapp. A jury trial began on December 11, 2001. At trial, appellant presented several experts to testify as to Dr. Rosenwasser's negligence. Dr. Rosenwasser responded by presenting his own experts to rebut appellant's experts' testimony.
 {¶ 8} After presentation of the evidence, appellant moved for a directed verdict. In support, appellant asserted that because no defense witness testified to any alternative cause, James' injury was the result of excessive traction. Thus, appellant argued, that reasonable minds could come to but one conclusion as to the cause of James' injury: excessive traction employed by Dr. Rosenwasser. However, the court denied appellant's motion stating that there were enough questions of fact to submit the issue of cause to the jury.
 {¶ 9} Dr. Rosenwasser made two motions for directed verdict during the trial: at the close of appellant's case and at the close of all the evidence. Dr. Rosenwasser asserted that there was no competent evidence presented in the case demonstrating that he breached the standard of care thereby causing James' injury. Nevertheless, the trial court denied both motions.
 {¶ 10} On December 14, 2001, after considering the evidence, the jury returned a unanimous verdict in Dr. Rosenwasser's favor. On December 17, 2001, the lower court rendered its judgment in Dr. Rosenwasser's favor. On January 16, 2002, appellant filed a timely notice of appeal from this judgment. Appellant assert the following assignment of error:
 {¶ 11} "The trial court erred to the prejudice of the plaintiffs-appellants in overruling their motion for directed verdict made at the close of the case and in permitting the jury to speculate as to the cause of the infant plaintiff's injury."
 {¶ 12} Appellant's assignment is grounded on her claim that the only explanation for James' injuries was Dr. Rosenwasser's application of excessive traction during the delivery of James. Appellant's claim rests heavily on testimony adduced from her experts suggesting that excessive traction was the only possible source of the damage to James' brachial plexus. Appellant further argues that because Dr. Rosenwassen offered no other causal explanation for the injuries, reasonable minds could not disagree that the cause was excessive traction. As such, appellant concludes the judge erred in overruling her motion for direct verdict because reasonable minds could come to but one conclusion with respect to the cause of the injury, i.e., excessive traction.
 {¶ 13} The standard for determining a motion for a directed verdict is well-established under Ohio law:
 {¶ 14} "Civ.R. 50(A)(4) provides that a court should direct a verdict when, `after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *.' Conversely, if reasonable minds could come to more than one conclusion on the evidence presented, the court should permit the issue to go to the jury." (Citations omitted.) DiSilvestro v. Quinn (Dec. 31, 1996), 11th Dist. No. 95-L-061, 1996 Ohio App. LEXIS 5950, 5, 6, citingWhite v. Ohio Dept. of Transp. (1990), 56 Ohio St.3d 39, 45. "Civ.R.50(A) * * * requires the trial court to give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence." Connollyv. Malkamaki, 11th Dist. No. 2001-L-124, 2002-Ohio-6933, at ¶ 15, citing Broz v. Winland (1994), 68 Ohio St.3d 521, 526; Keeton v.Telemedia Co. of S. Ohio (1994), 98 Ohio App.3d 405, 408.
 {¶ 15} In Ohio, a party must satisfy four basic elements to establish a claim for medical malpractice: (1) the existence of a duty owed to the plaintiff by the physician; (2) a breach of this duty by the physician; (3) a showing of the probability that the breach was a proximate cause of the harm to the plaintiff; and (4) damages. Stinson v.England (1994), 69 Ohio St.3d 451.
 {¶ 16} In relation to the second and third elements of the claim, the Supreme Court of Ohio has held:
 {¶ 17} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, paragraph one of the syllabus.
 {¶ 18} In order to show that the actions of the physician fell below the standard of care and that this breach was the cause of the injuries, Bruni requires a plaintiff to present expert testimony.DiSilvestro, supra, at 7, citing Kurzner v. Sanders (1993),89 Ohio App.3d 674, 679. In particular, an expert witness must testify as to the applicable standard of care, the breach of that standard, and proximate cause. DiSilvestro, supra, at 8, citing Schraffenberger v.Persinger (Sept. 25, 1996), 1st Dist. No. C-950868, 1996 Ohio App. LEXIS 4172.
 {¶ 19} In the instant case, appellant presented three expert witnesses regarding causation: Lawrence Borow, M.D., a board-certified obstetrician-gynecologist, Daniel G. Adler, M.D., a board-certified pediatric neurologist, and Rita Lee, M.D., the infant's treating pediatric neurologist. Each of appellant's experts testified that the use of excessive traction during a shoulder dystocia delivery constituted a deviation from accepted medical practice.
 {¶ 20} Dr. Borow testified that, in his view, excessive traction was used by Dr. Rosenwasser during the birth of James. As such, the child's brachial plexus was stretched and ultimately torn. He testified that there was no other explanation as to how the injury was caused under the circumstances. Dr. Borow further indicated that there was no other data available in the medical records to support an alternative explanation. However, on cross-examination, Dr. Borow admitted that Dr. Rosenwasser used the appropriate maneuvers once the shoulder dystocia was encountered and validated the use of gentle traction in the delivery of certain infants.
 {¶ 21} Similarly, Dr. Adler testified that, from the evidence in the medical records, there is no other explanation for the injuries but for Dr. Rosenwasser's application of excessive traction. Dr. Adler indicated that, in light of the records, the injury could not have occurred while the infant was in the uterus before labor began. As such, Dr. Adler maintained that all of the facts indicate that the injury occurred after delivery of the child's head. By deduction, therefore, Dr. Rosenwasser must have employed excessive traction to injure the child's brachial plexus.
 {¶ 22} On cross, Dr. Adler admitted that a brachial plexus injury can occur in the absence of excessive traction. Moreover, Dr. Adler was presented with three published articles documenting permanent brachial plexus injuries in the absence of shoulder dystocia and independent of traction. In response to their content, Dr. Adler stated his belief that the articles were based upon mere speculation. Dr. Adler further testified he could not quantify what amount of traction is excessive, moderate, or gentle, because that would be an obstetrical, rather than a neurological question.
 {¶ 23} Finally, Dr. Lee, James' treating pediatric neurologist, testified that "the cause of the injury was shoulder dystocia with enough traction exerted at the time of delivery to cause a significant, severe brachial plexus injury." Dr. Lee clarified that James had multiple ruptures of the brachial plexus, and that is very typically found in children in which there has been a "good amount" of traction applied. On cross-examination, Dr. Lee admitted that she had no standard of care criticisms or opinions regarding Dr. Rosenwasser. Moreover, Dr. Lee stated that there is some variation between fetuses with respect to their tolerance level before a permanent brachial plexus injury occurs. She also testified that she has seen significant brachial plexus injuries in babies born by caesarian section and that twenty percent of the brachial plexus injuries she treats are not related to shoulder dystocia.
 {¶ 24} To rebut the testimony of appellant's experts, appellee presented his own experts: Dr. Rosenwasser, appellant's obstetrician, David Burkons, M.D., a board certified obstetrician-gynecologist, and James Nocon, M.D., a board certified obstetrician-gynecologist and professor of Medicine.
 {¶ 25} Appellee, Dr. Rosenwasser, testified that he did employ gentle traction with a vacuum extractor to facilitate delivery of the baby's head. Moreover, he testified that after the infant's head was delivered, gentle traction was used to attempt to deliver the anterior shoulder, at which time the shoulder dystocia was encountered. After encountering the shoulder dystocia during the delivery, Dr. Rosenwasser testified that he engaged in appropriate obstetrical maneuvers and applied gentle traction to the baby's head in order to facilitate delivery.
 {¶ 26} Dr. Nocon testified that he found no evidence that Dr. Rosenwasser applied excessive or undue force to James' head during the delivery process. As such, Dr. Nocon concluded that Dr. Rosenwasser was not the cause of James' brachial plexus injury.
 {¶ 27} Further, in response to allegations that Dr. Rosenwasser should have known appellant was at a "high risk"[1] for delivering a baby with shoulder dystocia, Dr. Nocon testified that the risk factors for shoulder dystocia are not reliable predictors of the anomaly. According to Dr. Nocon's research, the occurrence of risk factors does not increase the probability of shoulder dystocia. As such, the fact that appellant exhibited several risk factors, did not imply that appellant was going to have a child with shoulder dystocia. According to Dr. Nocon, risk factors:
 {¶ 28} "tell you to look for certain things in the patient, which is exactly what Dr. Rosenwasser did in this case. He looked for diabetes. Even though he didn't find it, he treated her for it. He saw a fundal height that was elevated, so he looked for a big baby and didn't find it. That's all risk factors can do. They don't predict anything. They're a flag that says take a look. But otherwise it doesn't mean much."
 {¶ 29} In any event, Dr. Nocon concluded that Dr. Rosenwasser clearly complied with the standard of care in providing prenatal care to appellant. Moreover, Dr. Nocon stated that Dr. Rosenwasser managed the shoulder dystocia in a prudent and thorough manner thereby complying with the standard of care in managing James' delivery.
 {¶ 30} Finally, Dr. Burkons testified that the medical care and treatment provided by Dr. Rosenwasser during appellant's pregnancy, labor, and delivery complied with acceptable standards of care. Moreover, Dr. Burkons indicated that there was nothing in the medical records that indicated Dr. Rosenwasser used excessive traction at any time during the delivery of the infant.
 {¶ 31} From the above testimony, it is evident that the trial court did not err when it overruled appellant's motion for directed verdict. To wit, although appellant did present sufficient evidence to establish a prima facie case for medical malpractice, she overestimates the breadth of her experts' testimony. When we construe the evidence in the light most favorable to appellee, there is sufficient credible evidence to permit reasonable minds to come to different conclusions on the issue of causation.
 {¶ 32} As indicated above, in a medical malpractice case, a plaintiff must offer proof that the defendant physician breached the legally required standard of care and was negligent. Expert testimony is needed to establish both the standard of proper professional skill or care and a failure by the defendant to conform. In the instant case, appellant offered expert testimony as to the cause of the injury, viz., excessive traction. However, Dr. Rosenwasser testified to his specific, careful application of gentle traction in an effort to deliver James' anterior shoulder after shoulder dystocia was discovered. Moreover, Dr. Rosenwasser's experts testified that there was no evidence of excessive traction in the medical records. The jury also heard testimony indicating that permanent brachial plexus injuries can occur without application of traction and in the absence of shoulder dystocia. Both parties offered qualified experts to testify as to the standard of care and proximate cause. Because the testimony represented two rational competing views as to the cause of James' brachial plexus, reasonable minds could differ as to the issue of causation. Therefore, it was patently appropriate for the judge to overrule appellant's motion for directed verdict and permit the jury to weigh the evidence.
 {¶ 33} Moreover, appellant's assignment of error claims that the judge, by overruling appellant's motion for directed verdict, permitted the jury to "speculate" as to the proximate cause of James' injuries. We disagree.
 {¶ 34} As a general matter, the jury weighs the credibility of each expert and determines whether an expert's testimony is persuasive. If a jury determines an expert's testimony is entitled to no weight, it may disregard the expert's testimony entirely. Simply because the jury found insufficient evidence to support appellant's claim does not mean it speculated as to an alternative cause. Rather, the jury's verdict merely indicates that it simply was not persuaded that the cause of the injuries was, more likely than not, excessive traction. In effect, the jury's verdict means that appellant failed to meet her burden of proof with respect to its allegations. It does not suggest that the jury engaged in any "speculation" as to any other causal event which may or may not have taken place.
 {¶ 35} Finally, as a matter of technical import, appellant's basic argument is structurally invalid because the premise does not logically support the conclusion. Fundamentally, appellant's argument may be summed up as follows: There is no evidence to demonstrate that Dr. Rosenwasser did not apply excessive traction, therefore he must have applied excessive traction. Appellant's position implies that her assessment of the facts is true because Dr. Rosenwasser cannot prove them false. This is a fallacy because the fact that there is no evidence to suggest Dr. Rosenwasser did not use excessive traction does not imply that he used excessive traction. The absence of evidence means that we simply do not have enough facts or evidence to make a judgment. Such ignorance cannot be transmuted into knowledge any more than brass can be transmuted into gold. Thus, the lower court acted appropriately in overruling appellant's motion for directed verdict because the logic on which the motion stood was fundamentally flawed, i.e., by logical necessity reasonable minds could differ as to the cause of the injuries.
 {¶ 36} For the foregoing reasons, appellant's assignment of error is without merit and the judgment of the Portage County Court of Common Pleas is affirmed.
Judgment affirmed.
JUDITH A. CHRISTLEY and DIANE V. GRENDELL, JJ., concur.
[1] At trial, evidence was presented which indicated that infants born with shoulder dystocia stood a higher likelihood of suffering a permanent brachial plexus injury as a result of excessive traction employed by an obstetrician in interest of disengaging an infant's impacted shoulder. However, evidence was also offered stating that permanent brachial plexus injuries occurred irrespective of the existence of shoulder dystocia and in the absence of traction.