OPINION *Page 2 
{¶ 1} Plaintiffs-appellants Kaylee S. Wasmire, Brenda Wasmire and Kevin Wasmire appeal the November 21, 2005 jury verdict in the Stark County Court of Common Pleas, finding defendants-appellees Craig S. O'Dear, MD and Alliance Obstetrics, Inc. did not breach the standard of care in the within medical malpractice action.
 STATEMENT OF THE FACTS AND CASE {¶ 2} This appeal arises from a medical malpractice action against defendants-appellees relative to injuries sustained by Kaylee Wasmire at birth. Plaintiff-appellants allege Kaylee sustained shoulder and arm injuries during delivery as a direct and proximate result of Dr. O'Dear's use of excess traction in an attempt to release her shoulder lodged behind her mother's pubic bone. Appellants maintain the excess traction resulted in severe stretching of the nerves in Kaylee's left upper arm, known as the brachial plexus.
 {¶ 3} During discovery, appellees identified Dr. Stephen Emery, MD, a maternal-fetal specialist, as an expert witness. At his deposition testimony, Dr. Emery testified he did not have an opinion as to the mechanism of Kaylee's brachial plexus injury.
 {¶ 4} On November 9, 2005, appellants filed a motion in limine with the trial court to exclude any opinions which Dr. Emery might offer at trial as to the cause of Kaylee's injuries.
 {¶ 5} The trial commenced on November 14, 2005. Prior to jury selection, the trial court heard arguments relative to appellants' motion in limine. The trial court held *Page 3 
its ruling on the motion in limine in abeyance pending the start of testimony. The trial court eventually ruled Dr. Emery could testify as to potential alternative causes of the injury.
 {¶ 6} On November 18, 2005, the jury returned a unanimous verdict in favor of appellees finding, by a preponderance of the evidence, the care of Dr. Craig S. O'Dear rendered to Kaylee Wasmire did not fall below the standard of care for obstetricians.
 {¶ 7} Appellant now assigns as error,
 {¶ 8} "I. THE TRIAL COURT ERRED BY PERMITTING APPELLEES' EXPERT TO TESTIFY REGARDING ALTERNATIVE CAUSES OF INJURY WHEN HIS OPINIONS FAILED TO MEET THE REQUISITE DEGREE OF PROBABILITY.
 {¶ 9} "II. THE TRIAL COURT ERRED IN PERMITTING APPELLEES' EXPERT TO PROVIDE A NEW EXPERT OPINION AT TRIAL WITHOUT FIRST HAVING TENDERED A REPORT OR OTHERWISE NOTIFYING PLAINTIFF'S COUNSEL OF THE SUBSTANCE OF ANY NEW OPINIONS IN VIOLATION OF OHIO RULE OF CIVIL PROCEDURE 26(E)."
 I, II {¶ 10} In the first assignment of error, appellants argue the trial court erred in allowing Dr. Emery to testify as to alternative causes of injury when his opinions failed to meet the requisite degree of probability.
 {¶ 11} Initially, we note the jury never reached the issue of proximate cause, as the verdict specifically found Dr. O'Dear did not breach the standard of care for obstetricians in delivering Kaylee. We find appellant's arguments necessarily relate to the issue of causation; rather than breach of the standard of care. For that reason *Page 4 
alone we find any alleged error in the admission of Dr. Emery's testimony would not be prejudicial.
 {¶ 12} However, assuming arguendo the jury did consider causation testimony, albeit tangentially, in rendering its finding there was no breach of the standard of care, we elect to address the arguments raised by appellants.
 {¶ 13} Appellants filed a motion in limine to exclude Dr. Emery's opinions regarding any alternative cause or mechanism for Kaylee Wasmire's injury based upon his deposition testimony. Specifically, appellants cite the following exchange during Dr. Emery's deposition:
 {¶ 14} "Q. Well, what causes — tell me some of the other causes that medical science thinks result in an Erb's palsy after a severe shoulder dystocia is recognized.
 {¶ 15} "A. It's possible that the baby sustained trauma as it passed down through the birth canal and was not related to the forces applied by the operator.
 {¶ 16} "Q. Do you have an opinion in this particular case — I'm moving from a hypothetical to Dr. O'Dear's case, this one that you've studied or reviewed. Do you have an opinion within a reasonable medical certainty or probability, greater than 50 percent, that this was an in utero Erb's palsy injury?
 {¶ 17} "A. I don't know.
 {¶ 18} "Q. So you're saying you don't have an opinion on whether it's in utero; is that fair? You just said you don't know, so I —
 {¶ 19} "A. I don't know what the mechanisms are, so I can't pinpoint when it happened. *Page 5 
 {¶ 20} "Q. Well, I'm sure Susan has explained to you that under Ohio law, since law is different than medicine — you deal in science and you deal in almost certainty, at least 99.9 percent. The law is probability, greater then 50 percent. So when we say within a reasonable degree of medical certainty, Doctor, do you have an opinion in this case, what we are in effect saying, is it more probable than not, more likely than not. So would you follow that for me? And I understand you're a doctor and I'm a lawyer. And that's one of the problems in these kinds of case. We use different terms and we're used to thinking differently.
 {¶ 21} "But with that as a definition where I say do you have an opinion within a reasonable degree of probability, meaning greater then 50 percent, I would like you to apply that standard for me, if you would. And I'm going to ask you again, do you have an opinion within a reasonable degree of medical probability that Kaylee's injury occurred in utero?
 {¶ 22} "A. I don't know how to answer that, because I don't know what the mechanism was.
 {¶ 23} "Q. Okay. So you have no opinion? I mean when I ask for — I'm not trying to beat a dead horse here, but when I ask for a reasonable degree of medical probability, that's the only thing we can go on. I mean everything is possible. An alien could have flown down the night before and gone in and, I don't know, wreaked havoc with the baby.
 {¶ 24} "A. That hasn't been reported.
 {¶ 25} "Q. Well, maybe not in the medical journals. In think in the Star and the Enquirer it probably has been. *Page 6 
 {¶ 26} "Anything is possible obviously, but what we need from you as the expert in the case is an opinion within a reasonable degree of medical probability, which is greater than 50 percent. Now, what you're telling me is that because you don't know the mechanism of Kaylee's injury, you can't give an opinion as to what caused it, is that fair?
 {¶ 27} "A. That is fair."
 {¶ 28} Tr. at 25-27.
 {¶ 29} As stated above, the trial court postponed ruling on appellants' motion in limine until testimony began. On direct examination at trial, defense counsel solicited the following testimony of Dr. Emery:
 {¶ 30} "By Ms. Reinker:
 {¶ 31} "Q. In this case are you going to be offering an opinion as to what you believe is a reasonable degree of medical certainty what specifically caused Kaylee's brachial plexus injury?
 {¶ 32} "A. I don't know what caused her brachial plexus injury.
 {¶ 33} "Q. Okay. Do you share Dr. Edelberg's opinion or the testimony we have heard in this court that it was a [sic] caused by excessive lateral traction?
 {¶ 34} "A. Absolutely not."
 {¶ 35} "Q. Why not?
 {¶ 36} "A. Because —
 {¶ 37} "Q. I'm sorry. What do you believe were the more likely causes of the problem in this case?
 {¶ 38} Tr. at 772. *Page 7 
 {¶ 39} The exchange at trial continued:
 {¶ 40} "The Court: We got two things here. This goes back to the original issue that was raised by counsel. Now, I thought I heard him say he didn't know what caused it.
 {¶ 41} "Ms. Reinker: To a reasonable degree of medical certainty, correct. We're not offering an alternative theory. We're going to talk about the more likely causes.
 {¶ 42} "The Court: That's the same thing. More than likely is the same thing as medical probability from the case law. So I don't mind somebody testifying as to what the potential causes of something are.
 {¶ 43} "Ms. Reinker: Okay.
 {¶ 44} "The Court: But unless, one, he is willing to say that this, if he's allocating a cause, then he has to do it to a medical probability. Then we get to the question of he's just testified he doesn't know what caused it. And I need to know whether or not; again, it's a matter of disclosure.
 {¶ 45} "I don't want surprises. If he has already indicated that he is going to be advocating a particular cause, that's one thing, but I don't want him to come in today in court and then champion a particular cause. That's discovery issue.
 {¶ 46} "The second issue is based on the case law. If he's behind a particular cause, it has to be to a reasonable medical probability.
 {¶ 47} "Now, you're saying well, he isn't going to say that but he is going to say more than likely. Those are similar words in my mind. More than likely means more *Page 8 
than 50 percent, and that's exactly what the test is, so and he has already said that he doesn't know what caused it.
 {¶ 48} "So I'm somewhat befuddled, quite frankly, as to what you're getting at.
 {¶ 49} "Ms. Reinker: My understanding of the Stinson case is that if we were offering a specific alternative cause, if he was going to say specifically this or that, then he has to say it to a reasonable degree of medical certainty. He's honest, nobody can say that.
 {¶ 50} "The Court: All right.
 {¶ 51} "Ms. Reinker: But what he is now offering is possible causes which are more likely than the Plaintiff's theory, and that's another way Stinson found permissible, if he can say these other things are more likely.
 {¶ 52} "The Court: I will allow him to testify as to what alternative causes.
 {¶ 53} "Ms. Reinker: Okay.
 {¶ 54} "The Court: But if he doesn't know, he doesn't know.
 {¶ 55} "Ms. Reinker: Okay.
 {¶ 56} "The Court: If he's saying more than likely, then he's violating the Stinson case. It's my — it's in Stinson from my standpoint."
 {¶ 57} "* * *
 {¶ 58} "Mr. Schulman: Just for the record, Stinson is clearly implicated in this testimony. For the record, Dr. Emery was asked specifically if he had any opinions within a reasonable degree of medical probability as to what caused Kaylee's brachial plexus injury. *Page 9 
 {¶ 59} "He answered it at least three times in his testimony no, we do not have an opinion.
 {¶ 60} "Stinson case is identical to this. The expert witness'—
 {¶ 61} "The Court: Let me interrupt you just for a second, and no, you may not. You may proffer. I'm not going to have you make an argument that isn't the argument.
 {¶ 62} "I have already ruled in your favor. He cannot come up with an alternative theory unless he does it to a reasonable medical probability.
 {¶ 63} "More than likely is the same thing. He has indicated he doesn't have an opinion as to what caused it. Ergo, he can't champion one, two or three causes as being more likely than the cause that is being brought forward by the Plaintiffs.
 {¶ 64} "What he can do and what the Court has ruled is that Stinson does allow it. He may list what potential causes of an incident like this are (sic), but he cannot champion any one of them.
 {¶ 65} "Mr. Schulman: And I disagree with it.
 {¶ 66} "The Court: All right.
 {¶ 67} "Mr. Schulman: And that's why I wanted to proffer it. I'm not arguing, I'm just saying.
 {¶ 68} "The Court: Well, it's not a necessary proffer of evidence, Mr. Schulman. You voiced your objection. That's for the Court of Appeals to make the legal argument.
 {¶ 69} "Mr. Schulman: But the witness is here. He has given testimony, and all I'm saying is he's going to go in front of the Jury now after having no opinion and say this is possible, this is possible, this is possible. *Page 10 
 {¶ 70} "What is the purpose of that? If not to say that it is, that it's — what is the purpose of [sic] if not to allow the Jury to make all sorts of speculative guesses?
 {¶ 71} "That's not what we're here for, and that's why I am objecting on the grounds of Stinson. I think Stinson is clear. This is identical to me.
 {¶ 72} "The Court: Well, I disagree with you on Stinson.
 {¶ 73} "Mr. Schulman: All right.
 {¶ 74} "The Court: Anytime a medical can come in, in fact, that's not opinion. That's facts. What are the potential causes of something happening? That comes from experience. Where it becomes opinion is when you champion one of those and you opine this is what happened in this particular case.
 {¶ 75} "Mr. Schulman: All right.
 {¶ 76} "The Court: He cannot say that. What he can say is from experience from the literature there are five, there are ten potential causes of an incident. Stinson does not, and I have read that case carefully and subsequent cases that have described that case. That is not a problem. It would be unfair not to let a Jury know what the potential causes are. It's when they come in and they champion one or more of those theories, they have to do that to medical probability.
 {¶ 77} "He is not going to do that for two reasons. One is because it's discovery. Secondly because of Stinson.
 {¶ 78} Tr. at 773-779.
 {¶ 79} Following the trial court's ruling, the following exchange occurred during the testimony of Dr. Emery:
 {¶ 80} "By Ms. Reinker: *Page 11 
 {¶ 81} "Q. I'm sorry. What impact would that position have on the brachial plexus?
 {¶ 82} "Mr. Schulman: Objection.
 {¶ 83} "The Court; I'm going to sustain that objection as well.
 {¶ 84} "By Ms. Reinker:
 {¶ 85} "In your opinion, Doctor, are there alternative causes for the brachial plexus injury that Kaylee experienced?
 {¶ 86} "Yes.
 {¶ 87} "Mr. Schulman: Just object.
 {¶ 88} "The Court: Sustained.
 {¶ 89} "Mr. Schulman: Sorry, Doctor.
 {¶ 90} "Ms. Reinker: May we approach?
 {¶ 91} "The Court: Yes.
 {¶ 93} "(A conference was held at the bench outside the hearing of the jury.)
 {¶ 94} "Ms. Reinker: I thought the court said I could ask about alternative causes.
 {¶ 95} "The Court: But not as to this particular; in other words, when someone suffers an injury, give it that description, what is it called, brachial?
 {¶ 96} "Mr. Schulman: Brachial plexus.
 {¶ 97} "The Court: Brachial plexus. When someone from your experience, what are the potential causes for that. That's okay, but when you start to getting into this case and giving opinions as to what the causes were, then drawing the line. *Page 12 
 {¶ 98} "Ms. Reinker: Not even an alternative line.
 {¶ 99} "The Court: So I'm asking you to keep away from this particular one. That's what I have said. He cannot champion a cause or causes as being what caused this injury in this case. That is what the Stinson case, that has to a medical certainty.
 {¶ 100} "Ms. Reinker: I respectfully disagree as I thought Stinson said that we're allowed to present other potential causes.
 {¶ 101} "The Court: I'm allowing you to do that but not with regard to this particular baby and what cause.
 {¶ 102} "If you take a step back, I'm basically doing this from my understanding of the case law. It is no different. I'm just saying that you cannot say with reasonable medical probability in this case what the cause or causes were. What I am allowing you in general is what are potential causes. They have objected to that. I'm allowing you to do that. That's the ruling."
 {¶ 103} Tr. at 782-784.
 {¶ 104} At trial in this matter, the trial court permitted Dr. Emery to list for the jury four other possible causes of brachial plexus injuries other than excessive lateral force: maternal expulsive forces, uterine abnormality, rapid change in baby's position and normal fetal position.
 {¶ 105} Both parties cite the Ohio Supreme Court decision inStinson v. England (1994), 69 Ohio St.3d 451.
 {¶ 106} In Stinson, a medical malpractice action involving a failure to timely recognize fetal distress, the defendant's expert witness, Dr. Diana Ross, testified the injury suffered by the child could have been caused by three different events: (1) *Page 13 
maternal hypotension, (2) placental insufficiency (i.e., the theory of appellants), or (3) compression of the umbilical cord. Of these three possibilities, Dr. Ross stated the "most likely" cause of the injuries was the compression of the umbilical cord.
 {¶ 107} The jury returned a verdict finding while the defendant physician was negligent; his negligence was not the proximate cause of the child's injuries.
 {¶ 108} The Court held:
 {¶ 109} "We therefore conclude that expert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue.
 {¶ 110} "Applying the foregoing standard to the case at bar, we note at the outset that appellants bore the burden of persuasion to demonstrate that the injuries sustained by Julie Stinson were proximately caused by the negligence of appellee. A prima facie demonstration with respect to causation was accomplished through the testimony of Dr. Warner, who stated that the probable cause of the injuries was the negligence of appellee. This evidence along with evidence directed to other elements of the claim established a prima facie case so as to present a jury question and avoid a directed verdict. Among the devices available to appellee to meet this prima facie case were the cross-examination of Dr. Warner, the presentation of contrary evidence that the negligence of appellee was not the probable cause of the injuries or the presentation of evidence establishing an alternative cause for the injuries. Where this last approach is pursued, the proponent of the alternative cause theory must support the theory with *Page 14 
competent evidence establishing its truth. That is, a proponent of an alternative cause must adduce expert testimony of its probable nature.
 {¶ 111} "With these principles in mind, we now address the argument of appellants that the expert witness on behalf of appellee failed to express an opinion with respect to causation sufficient to satisfy the requisite standard of probability. Appellants contend that the opinion of Dr. Ross that an alternative cause was "most likely" responsible for the injuries to Julie Stinson was incompetent, since a cause which is the most likely of three alternatives may nevertheless represent less than a fifty percent possibility of occurrence. Had the alternative causes considered by Dr. Ross not included the cause espoused by appellants, this would undoubtedly be true. Such testimony regarding the "most likely" alternative cause would be incompetent not only because it lacks the degree of probability necessary for admissibility but also because it does nothing to controvert the evidence of appellants that the negligence of appellee was the probable explanation for the injuries sustained by Julie Stinson.
 {¶ 112} "In this regard, an expert for the defense is precluded from engaging in speculation or conjecture with respect to possible causes as is an expert who testifies for the plaintiff.
 {¶ 113} "The fallacy in the argument of appellants, however, is that their theory was one of the alternative causes considered by appellee's expert. Among the potential causes considered by her, another theory of causation (e.g., compression of the umbilical cord) was deemed to be the most likely. Even if it had a likelihood of less than fifty percent, it had a greater likelihood than the theory espoused by appellants, in the view of the expert. The significance of the testimony, therefore, was in its ascription of *Page 15 
likelihood not to the alternative cause but to the cause espoused by appellants. If the most likely cause among alternatives, including the theory of appellants, has a probability of less than fifty percent,a fortiori appellants' theory would be even less likely. If the most likely alternative had a probability greater than fifty percent, it follows that the less likely option could not have a probability of fifty percent. * * *
 {¶ 114} "The testimony of Dr. Ross that another event was the most likely cause of the injuries was therefore tantamount to an opinion that the cause advanced by appellants was not the probable cause. It was therefore competent evidence which controverted a fact propounded by appellants. While the better practice would certainly have been to have the expert testimony directed to the probability of an alternative cause or the lack of probability of the causation theory advanced by appellants, we are unpersuaded that the evidence adduced by appellee was inadmissible."
 {¶ 115} Upon review of the record cited above and the Ohio Supreme Court holding in Stinson, we find the trial court properly allowed Dr. Emery to testify as to the other potential causes of Kaylee Wasmire's injuries. Dr. Emery listed four possible causes of brachial plexus injuries, other than that proposed by appellants.[1] Dr. Emery *Page 16 
did not assert one cause was the actual proximate cause or the more likely cause, let alone that one was the "most likely" cause as allowed in Stinson, but merely espoused four other potential causes. Pursuant toStinson, we conclude the trial court properly permitted the testimony.
 {¶ 116} The first assignment of error is overruled.
 II {¶ 117} Appellants' second assignment of error argues prejudice caused by the testimony introduced at trial before the jury. Specifically, appellants cite the following exchange:
 {¶ 118} "Q. Do you believe the position in which she was delivered was an alternative cause of what happened to her?
 {¶ 119} "Mr. Schulman: Objection.
 {¶ 120} "The Court: Sustained.
 {¶ 121} "By Ms. Reinker:
 {¶ 122} "Q. I'm sorry. What impact would that position have on the brachial plexus?
 {¶ 123} Mr. Schulman: Objection.
 {¶ 124} "The Court: I'm going to sustain that objection as well.
 {¶ 125} "By Ms. Reinker:
 {¶ 126} "Q. In your opinion, Doctor, are there alternative causes for the brachial plexus injury that Kaylee experienced?
 {¶ 127} "A. Yes.
 {¶ 128} "Mr. Schulman: Just object. *Page 17 
 {¶ 129} "The Court: Sustained.
 {¶ 130} "Mr. Schulman: Sorry, Doctor.
 {¶ 131} "Ms. Reinker: May we approach?
 {¶ 132} "The Court: Yes."
 {¶ 133} Tr. at 782.
 {¶ 134} Appellants assert Dr. Emery's failure to disclose his opinions regarding potential alternative causes of Kaylee Wasmire's injuries resulted in "trial by ambush."
 {¶ 135} We note, the trial court repeatedly sustained appellants' objections and we presume the jury followed the trial court's instructions. Therefore we fail to find any prejudice accrued to appellants with reference to that portion of the record they cite.
 {¶ 136} Appellants cite Ohio Civil Rule 26(E), which states:
 {¶ 137} "(E) Supplementation of responses
 {¶ 138} "A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
 {¶ 139} "(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify.
 {¶ 140} "(2) A party who knows or later learns that his response is incorrect is under a duty seasonably to correct the response. *Page 18 
 {¶ 141} "(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through requests for supplementation of prior responses."
 {¶ 142} At deposition, Dr. Emery testified, in pertinent part:
 {¶ 143} "Q. And you're saying that when a baby is delivered as the result of a shoulder dystocia and has a brachial plexus or Erb's palsy injury, no one knows the mechanism of that injury?
 {¶ 144} "A. That's correct.
 {¶ 145} "Q. What literature do you point to that supports that?
 {¶ 146} "A. Well, there are documented cases of permanent brachial plexus palsy after uncomplicated spontaneous vaginal delivery, after cesarean section, after cesarean section that precedes labor. So I think to make the argument that brachial plexus palsy is a result of excess lateral traction at the time of delivery is untenable.
 {¶ 147} "Q. Well, I'm trying to figure out what you're saying here. Are you saying that if you have hypothetically here, not this case, excess lateral traction, that that cannot result in a brachial plexus or Erb's palsy injury?
 {¶ 148} "A. I suppose it could. Lots of things could. We don't understand the mechanism.
 {¶ 149} "Q. But I'm just asking about excess lateral traction. Assume hypothetically again that you're delivering a baby and you encounter let's say a severe shoulder dystocia, and you use excess lateral traction to attempt to get the baby out, and the baby turns out having a severe brachial plexus or Erb's palsy injury. Are you saying that those are not related? *Page 19 
 {¶ 150} "A. There may have been other factors involved.
 {¶ 151} "Q. Give me an example. I'm just trying to clarify here, because I guess — I guess what you're saying is that when a baby is delivered after a severe shoulder dystocia and the baby has an Erb's palsy, there's no relationship between the two, we just don't know?
 {¶ 152} "A. It may not be as clear as cause and effect.
 {¶ 153} "Q. Well, what causes — tell me some of the other causes that medical science thinks result in an Erb's palsy after a severe shoulder dystocia is recognized.
 {¶ 154} "A. It's possible that the baby sustained trauma as it passed down through the birth canal and was not related to the forces applied by the operator.
 {¶ 155} "Q. Do you have an opinion in this particular case — I'm moving from a hypothetical to Dr. O'Dear's case, this one that you've studied or reviewed. Do you have an opinion within a reasonable medical certainty or probability, greater than 50 percent, that this was an in utero Erb's palsy injury?
 {¶ 156} "A. I don't know.
 {¶ 157} "Q. So you're saying you don't have an opinion on whether it's in utero; is that fair? You just said you don't know, so I —
 {¶ 158} "A. I don't know what the mechanisms are, so I can't pinpoint when it happened.
 {¶ 159} "Q. Well, I'm sure Susan has explained to you that under Ohio law, since law is different than medicine — you deal in science and you deal in almost certainty, at least 99.9 percent. The law is probability, greater than 50 percent. So when we say within a reasonable degree of medical certainty, Doctor, do you have an opinion in this *Page 20 
case, what we are in effect saying, is it more probable than not, more likely than not. So would you follow that for me? And I understand you're a doctor and I'm a lawyer. And that's one of the problems in these kinds of cases. We use different terms and we're used to thinking differently.
 {¶ 160} "But with that as a definition where I say do you have an opinion within a reasonable degree of probability, meaning greater than 50 percent, I would like you to apply that standard for me, if you would. And I'm going to ask you again, do you have an opinion within a reasonable degree of medical probability that Kaylee's injury occurred in utero?
 {¶ 161} "A. I don't know how to answer that, because I don't know what the mechanism was.
 {¶ 162} "* * *
 {¶ 163} "Anything is possible obviously, but what we need from you as the expert in the case is an opinion within a reasonable degree of medical probability, which is greater than 50 percent. Now what you're telling me is that because you don't know the mechanism of Kaylee's injury you can't give an opinion as to what caused it, is that fair?
 {¶ 164} "A. That is fair."
 {¶ 165} Tr. at 23-27.
 {¶ 166} Then, at trial Dr. Emery testified:
 {¶ 167} "By Ms. Reinker:
 {¶ 168} "Q. I would like you to assume that there has been testimony in this case that Dr. O'Dear must have used excess lateral traction during the delivery in order for this injury to have occurred. *Page 21 
 {¶ 169} "Do you agree with that?
 {¶ 170} "A. I don't agree that there was extra lateral traction.
 {¶ 171} "Q. Do you agree that that's the only way this injury could have occurred in this case?
 {¶ 172} "A. No.
 {¶ 173} "Q. In fact, just briefly aren't there some situations where excess lateral traction would be appropriate?
 {¶ 174} "A. Absolutely."
 {¶ 175} "* * *
 {¶ 176} "Q. Let me — in the past were there assumptions made as to the cause of brachial plexus injuries?
 {¶ 177} "A. Yes.
 {¶ 178} "Q. And what was the assumption?
 {¶ 179} "A. The assumption was it was because of the operator, the obstetrician or midwife or someone who exerted too much lateral traction.
 {¶ 180} "Q. Is that still the thinking?
 {¶ 181} "A. No.
 {¶ 182} "* * *
 {¶ 183} "By Ms. Reinker:
 {¶ 184} "Q. In general, are there other potential causes for brachial plexus injuries other than excess lateral traction?
 {¶ 185} "A. Yes.
 {¶ 186} "Q. Mr. Schulman: For the record, objection. *Page 22 
 {¶ 187} "The Court: Overruled.
 {¶ 188} "By Ms. Reinker:
 {¶ 189} "Q. And I'm sorry. Your answer, sir?
 {¶ 190} "A. Yes, there are.
 {¶ 191} "Q. And what are some of those other potential causes?
 {¶ 192} "A. As we talked about with the drawing the maternal expulsive forces can cause stretch on the nerve potentially in utero, it can cause nerve injury. It's possible that there is some type of uterine abnormality like a fibroid tumor, that is a fibroid, a ball of muscle that can serve as an obstruction even before the onset of labor and can cause stretch of that shoulder and neck.
 {¶ 193} "It's possible that baby, rapid change in baby's position from vertex to breech, which is butt first, to vertex, just during the act of labor, the early stages of labor. We don't really understand what's going on in there in the uterus in the early stages of labor and during the expulsion.
 {¶ 194} "Q. Could have normal fetal position, perhaps of the fetal head potentially cause a brachial plexus injury?
 {¶ 195} "A. Yes."
 {¶ 196} Tr. at 761-786.
 {¶ 197} The fact Dr. Emery testified he did not know what the mechanism(s) was (were) that caused plaintiff's injury, is not the same as him testifying he does not know of other potential causes of plaintiff's injury. Dr. Emery's testimony as to other potential causes is not inconsistent, nor a "surprise" based upon his statement he did not know what caused plaintiff's injury. Having concluded in the first assignment of error Dr. *Page 23 
Emery's testimony as to the other potential causes was admissible, we find appellant's claim of "trial by ambush" unpersuasive.
 {¶ 198} Accordingly, we overrule appellant's second assignment of error.
 {¶ 199} The judgment of the Stark County Court of Common Pleas is affirmed.
 Hoffman, J. Wise, P.J. and Edwards, J. concur *Page 24 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Upon review of Dr. Emery's trial testimony, we read Dr. Emery's opinion to consider excess lateral traction as a potential cause of brachial plexus injuries in general. Specifically, at trial, Dr. Emery answered:
"By Ms. Reinker:
"Q. In general, are there other potential causes for brachial plexus injuries other than excess lateral traction?
"A. Yes."
Tr. at 784-785.
Accordingly, Dr. Emery's testimony offers the jury four possible causes of the injury, other than excess lateral traction. Though Dr. Every opined excess lateral traction was not the cause of appellant's injury in this case, Dr. Emery does include excess lateral traction as a possible cause of brachial plexus injuries. *Page 1