OPINION
{¶ 1} This is an appeal by plaintiff-appellant, James Clifton, from a judgment of the Ohio Court of Claims, finding in favor of defendants-appellees, Ohio Department of Rehabilitation and Correction ("ODRC") and the Ohio Department of Administrative Services, Office of Risk Management (collectively "appellees"), on appellant's negligence claim.
 {¶ 2} Appellant is an inmate and currently serving time at the Pickaway Correctional Institution, following his conviction for aggravated murder. On July 5, 2001, *Page 2 
appellant underwent open heart surgery at the Ohio State University Medical Center ("OSU Medical Center"). As part of this procedure, physicians make an incision to the patient's sternum to gain access to the heart area; following the bypass operation, the sternum area is then closed by the use of stainless steel wires. Following appellant's surgery, on July 11, 2001, he was transported by van from the OSU Medical Center to the Corrections Medical Center ("CMC"), in Columbus.
 {¶ 3} On June 25, 2003, appellant filed a complaint against appellees, alleging negligence arising out of the van ride to CMC. More specifically, appellant alleged that he was placed in a wheelchair and handcuffed and shackled for the ride in the van; further, that the wheelchair brakes were loose, and the straps holding the chair were not properly secured, causing him to be thrown about the interior, resulting in injury to his surgically wired sternum and chest. Appellant alleged that, as a result of appellees' negligence in failing to secure him properly during the transport, he required further surgery to repair the damage, and that he suffered an infection following that surgery.
 {¶ 4} The Court of Claims bifurcated the issues of liability and damages, and the matter came for trial before the court on January 30, 2006, on the issue of liability. Appellant, age 59, testified on his own behalf, and gave the following testimony of the events at issue.
 {¶ 5} In June and July of 2001, appellant began experiencing chest pains. As a result, he was transported to the OSU Medical Center on July 5, 2001, where he underwent open heart surgery. After approximately four days, he was transported back to CMC in a van with a wheelchair lift.[1] *Page 3 
 {¶ 6} At the time of the transport, there were two correction officers and another inmate in the van; appellant, however, has been unable to determine the names of the two transport officers or the other inmate who accompanied him to CMC. According to appellant, the wheelchair was not secured with straps; rather, there was a strap across his chest, and the wheelchair brakes "were on."[2] (Tr. at 17.) Appellant gave the following testimony concerning his ride to CMC:
 On the way back, just come out there and we go and get on the freeway, and we were going around there and that guy pushed the gas to the van to go around and get up some speed to get on the freeway, and when he did, the wheelchair started moving forward, caught on my neck, and I twisted sideways like this, and the strap went up over my head, and the chair just rolled to the back. They got this like screen with a bunch of holes in it, like a metal kind of case, and when they pumped that, it caused this loud popping noise in my chest.
(Tr. 18-19.)
 {¶ 7} When he arrived at CMC, appellant testified that he told an officer about the incident, and the officer told him to speak to a nurse. Appellant was in pain at the time, and had difficulty breathing.
 {¶ 8} On July 14, 2001, appellant was returned to OSU Medical Center and underwent further surgery. He also developed an infection that required treatment. In November 2001, appellant filed an informal complaint at the institution regarding the incident.
 {¶ 9} On cross-examination, appellant stated that he was facing the back door of the van during the transport to CMC. The wheelchair rolled several feet, and the other inmate grabbed the wheelchair as it came to a screen partition. Appellant stated that he *Page 4 
told a nurse at CMC about rolling in the van. However, when appellant returned to the emergency room at OSU Medical Center, he did not recall telling anyone about rolling in the van or a popping sound, nor did he recall telling any physicians about the incident.
 {¶ 10} Todd Nickison, currently an assistant nurse manager at Doctors West Hospital, was formerly employed by ODRC from 1999 until 2001, and he worked at CMC during that time. Nickison reviewed CMC progress notes regarding appellant's treatment, prepared by CMC staff, including Nickison's own notes taken on July 11 and 12, 2001. Nickison testified there was nothing in the progress notes indicating that appellant complained of injury from riding in a van from the hospital, nor were there any references in the report as to chest pain on those dates. An entry on July 13 indicated that appellant was complaining of pain, and was unable to take deep breaths.
 {¶ 11} Cary Sayers is an institutional investigator with CMC. Sayers made several attempts to determine the name of the transport officer who was driving the van in which appellant was transported on the date of the alleged incident; Sayers was unable to find any records revealing the name of the driver.
 {¶ 12} Dr. Martin O. Akusoba, the chief medical officer at CMC, was unable to testify at trial because of illness. In lieu of his trial testimony, Dr. Akusoba's deposition was taken subsequent to trial (on February 7, 2006), and admitted as part of the record of proceedings. His testimony will be discussed more fully, infra.
 {¶ 13} The deposition testimony of Toni Lynne Brady, a registered nurse, was also admitted at trial. In July 2001, Brady was on staff as a nurse at CMC. Brady was asked to review progress notes she made on July 12, 2001, shortly after appellant was admitted to CMC. Brady's notes indicate no unusual circumstances regarding appellant's chest incision, nor do the notes reflect that appellant complained of any chest pain. *Page 5 
 {¶ 14} The Court of Claims issued its decision on June 1, 2006, finding that appellant had failed to prove, by a preponderance of the evidence, that appellees were negligent. The decision of the court was journalized by judgment entry filed on that same date.
 {¶ 15} On appeal, appellant sets forth the following three assignments of error for this court's review:
 ASSIGNMENT OF ERROR NO. 1:
 THE TRIAL COURT ERRONEOUSLY IGNORED DEFENDANT-APPELLEE'S FAILURE TO PRODUCE TRANSPORT OFFICERS OR PROVIDE NAMES OF THE OFFICERS AND THE INMATE TRANSPORTED WITH PLAINTIFF-APPELLANT AND EXPLAIN THE FAILURE TO RESPOND TO COMPLAINTS AND GRIEVANCES AND THE INFERENCE TO BE DRAWN FROM THESE FAILURES.
 ASSIGNMENT OF ERROR NO. 2:
 THE TRIAL COURT ERRED IN OVERRULING PLAINTIFF-APPELLANT'S OBJECTIONS TO DR. AKUSOBA'S TESTIMONY, EXPRESSING IMPROPER OPINIONS REGARDING CLIFTON'S CONDITION AND ITS CAUSE.
 ASSIGNMENT OF ERROR NO. 3:
 THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 16} Appellant's assignments of error are interrelated and will be considered together. Appellant's primary contention is that the decision of the Court of Claims, finding in favor of appellees, was against the manifest weight of the evidence.
 {¶ 17} In Ensman v. Ohio Dept. of Rehab. Corr., Franklin App. No. 06AP-592, 2006-Ohio-6788, at ¶ 4, this court discussed the task of a reviewing court when addressing a manifest weight claim, holding in relevant part: *Page 6 
 Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, * * * syllabus. In addressing a judgment of the trial court on the basis that the verdict is against the manifest weight of the evidence, an appellate court conducts the same manifest weight analysis in both criminal and civil cases. Flowers v. City of Whitehall, Franklin App. No. 01AP-1150, 2002-Ohio-3890, at P12. The court, reviewing the entire record, must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, * * * citing State v. Martin
(1983), 20 Ohio App.3d 172, 175, * * * However, the credibility of witnesses is an issue primarily for the trier of fact, who stands in the best position to evaluate such matters. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, * * * If the evidence is susceptible to varied conclusions, this court must interpret it in a manner consistent with the findings of fact, verdict, and judgment of the trial court. Briscoe v. Ohio Dept. of Rehab. Corr, Franklin App. No. 02AP-1109, 2003-Ohio-3533, at P19.
 {¶ 18} In order to establish a cause of action based upon negligence, a plaintiff must show "the existence of a duty, a breach of that duty, and an injury resulting proximately therefrom." Moore v. Ohio Dept. ofRehab. Corr. (Nov. 27, 1990), Franklin App. No. 90AP-410. In the context of the custodial relationship between ODRC and prisoners, the state owes a common-law duty of reasonable care and protection from unreasonable risks. Zeigler v. Ohio Dept. of Rehab. Corr, Franklin App. No. 02AP-826, 2003-Ohio-3337, at ¶ 17. Reasonable care has been defined as "that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know."McElfresh v. Ohio Dept. of Rehab. Corr, Franklin App. No. 04AP-177,2004-Ohio-5545, at ¶ 16. The *Page 7 
state, however, is not an insurer of the safety of prison inmates, and a special relationship between the state and the inmate does not expand or heighten the duty of ordinary reasonable care. Id.
 {¶ 19} We will first address one of appellant's primary contentions, raised under his second assignment of error, in which he asserts that the Court of Claims erred in overruling his objections to the deposition testimony of Dr. Akusoba. Appellant contends that several improper questions by counsel for appellees left the trial court with the inference that appellant was suffering from medical conditions that caused his re-admission to the hospital (as opposed to injuring his chest during the van ride). Appellant argues that this witness ultimately expressed improper opinions regarding appellant's condition as a result of the questioning.
 {¶ 20} During his deposition, Dr. Akusoba noted that medical records dated prior to appellant's heart surgery indicated he suffered from chronic obstructive pulmonary disease ("COPD"). The physician described COPD as "a chronic disease of the lungs where a patient is chronically in respiratory distress." (Dr. Akusoba Depo. at 18.) In patients with COPD, the lungs sometimes enlarge to the point that they physically press outward on the rib cage. According to Dr. Akusoba, it would be expected that an individual with COPD, and who also develops a lung infection, would experience coughing spells that might put pressure on the sternum. These coughing spells could lead to "acute exacerbation of COPD." (Dr. Akusoba Depo. at 19.)
 {¶ 21} Dr. Akusoba further testified that a patient undergoing a trauma sufficient to cause steel wires to pull through his sternum would be expected to demonstrate elevated vital signs immediately afterward. However, appellant's vital signs, as recorded by medical personnel on July 11 and 12, 2001, did not suggest appellant was in significant *Page 8 
distress or pain at that time. Dr. Akusoba also testified that appellant's medical records indicated he had an infection at his surgical site when he was re-admitted to OSU Medical Center. More specifically, the physician testified that a medical report indicated, as of July 15, 2001, the presence of the organism "[m]ethicillin-resistant Staphylococcus aureus." (Dr. Akusoba Depo. at 21.) Dr. Akusoba described this as "a resistant organism that usually causes infection in people, especially immunocompromised by COPD." (Dr. Akusoba Depo. at 21.) Appellant's medical records also indicated a white blood count, a high creatinine reading, retention of carbon dioxide, as well as a chest x-ray revealing right pleural effusion, suggesting diagnoses including "COPD exacerbation, pneumonic event [and] kidney failure." (Dr. Akusoba Depo. at 37.)
 {¶ 22} During the deposition, counsel for appellees asked Dr. Akusoba the following question: "Would the likely cause of any of those potential diagnoses that you have listed — would the likely cause of those in your opinion have any connection to claimed history that the patient had rolled six feet in his wheelchair several days before that and come to an abrupt stop?" (Dr. Akusoba Depo. at 38.) Over objection, the physician replied, "no." (Dr. Akusoba Depo. at 38.)
 {¶ 23} Appellant asserts that the physician's opinion was not based upon the proper standard of a reasonable degree of medical certainty. In support, appellant relies upon the Ohio Supreme Court's decision inStinson v. England (1994), 69 Ohio St.3d 451, 456, in which the court held in part: "[E]xpert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue." *Page 9 
 {¶ 24} In Stuller v. Price, Franklin App. No. 03AP-66, 2004-Ohio-4416, the appellant asserted error on the basis that a defense expert witness had failed to properly phrase his expert opinion in terms of medical probability. During his testimony, the defense expert opined that it was "extremely unlikely" that ventilator problems contributed to the appellant's blindness, tremors, and an inability to walk. InStuller, supra, at ¶ 76, this court, in construing Stinson, supra, held that the expert's statement was "tantamount to an opinion that the cause advanced by plaintiffs was not the probable clause," and that the testimony was "competent evidence that refuted a fact propounded by plaintiffs." Further, because the significance of the expert's testimony was in its "ascription of a likelihood that was contrary to the cause espoused by plaintiffs," and "not to an alternative cause," such testimony was not in contravention of Stinson. Id.
 {¶ 25} Similarly, in the instant case, the challenged testimony at issue, in which Dr. Akusoba stated it was not likely appellant's act of rolling six feet in a wheelchair that caused his chest pain, was "tantamount to an opinion that the cause advanced by [appellant] was not the probable cause." Stuller, supra, at ¶ 76. Nor did the physician assert that "one cause was the actual proximate cause or the more likely cause," but, rather, "merely espoused * * * other potential causes."Wasmire v. O'Dear, Stark App. No. 2005CA00319, 2007-Ohio-736, at ¶ 115. See, also, Wissing v. D.F. Electronics, Inc. (Sept. 26, 1997), Hamilton App. No. C-950915 (physician's testimony was significant, not to establish the cause of plaintiff's injury, but to show that plaintiff's assigned causation was not probable). Accordingly, we do not find the testimony at issue to be in contravention of Stinson, supra.
 {¶ 26} Assuming, however, that the challenged testimony was speculative, the Court of Claims could have found, independent of Dr. Akusoba's deposition testimony, *Page 10 
that appellant failed to prove his negligence claim. Although much of appellant's argument regarding the manifest weight of the evidence is directed at the testimony of the physician, the Court of Claims also found appellant's testimony to be simply not credible. Specifically, the Court of Claims held in part:
 Plaintiff was unable to provide the court with any credible, corroborating evidence that he was improperly secured in the transport van. Plaintiff's testimony was often incomplete due to lapses in memory and inconsistency. As such, the court finds plaintiff's testimony to be less than credible. Additionally, while plaintiff claims that the incident caused him severe pain and injury, there is no written record of plaintiff's notifying anyone about it until approximately four months after it allegedly occurred.
 {¶ 27} The record supports the Court of Claims' determination that there were inconsistencies and discrepancies in appellant's testimony, as well as a lack of corroborating evidence that appellant ever informed any medical personnel, at the time of the events at issue, that he injured his chest after rolling in the van. Although appellant contends he told a nurse at CMC about rolling in the van, there are no notations in any of his medical records, despite testimony that such matters would have been documented. Nickison, a nurse on duty at the time appellant was admitted at CMC, testified there was nothing in the progress notes from July 11 or 12, 2001, indicating that appellant complained of injury from riding in a van from the hospital, nor were there any references in the report as to chest pain on those dates.
 {¶ 28} Brady, a registered nurse on duty at CMC at the time appellant was admitted gave similar testimony. Brady's progress notes indicate no unusual circumstances regarding appellant's chest incision, nor do the notes reflect that appellant complained of any chest pain. According to Brady, had appellant complained to her of *Page 11 
chest pain, she would have informed a physician, and an EKG would likely have been ordered.
 {¶ 29} Following his re-admission to the OSU Medical Center, on July 15, 2001, there are no notations in appellant's medical records that he complained of suffering an injury while being transported from OSU Medical Center to CMC. When questioned whether he told anyone at the OSU Medical Center about rolling in the van, appellant responded: "I can't really recall telling anybody specifically in the emergency room." (Tr. at 40.) When asked if he informed any physicians about rolling in the van and feeling a popping sound in his chest, appellant responded: "I don't think so." (Tr. at 41.)
 {¶ 30} Here, the Court of Claims could have reasonably found circumstances casting doubt upon the veracity of appellant's claim that he informed a nurse at CMC about rolling in the van. The lack of any contemporaneous documentation in the medical records, and the fact appellant waited over four months to file an informal complaint, are matters going to the credibility of appellant's account. Further, by his own admission, appellant failed to inform any physicians about the incident, or a popping sound in his chest, at the time he was re-admitted for treatment.
 {¶ 31} Finally, in addition to the previously noted testimony of Dr. Akusoba, appellant's medical records, which were admitted at trial without objection, indicate that appellant complained of coughing and headaches as opposed to any type of injury from being transported. An emergency room report by Dr. Michael Waite, dated July 14, 2001, states in part: "Based upon this patient's history and physical examination it appeared that he most likely was having an acute COPD exacerbation." (Joint Exhibit No. 5.) A report by Dr. Andrew Goldstein, appellant's treating physician at OSU Medical Center, dated July 16, 2001, states that appellant had "several postoperative risk factors including a *Page 12 
severe COPD, as well as inability to self ambulate because of a chronic cervical spinal condition[.]" (Joint Exhibit No. 6.) A discharge summary by Dr. Goldstein, dated September 12, 2001, states that appellant suffered from "an exacerbation of COPD and had a number of coughing spells, and returned to the hospital with sternal dehiscence." (Joint Exhibit No. 6.)
 {¶ 32} Based upon a review of the testimony and other evidence, the Court of Claims could have reasonably concluded that appellant failed to prove, by a preponderance of the evidence, his negligence claim. We therefore find no merit to appellant's contention that the decision of the Court of Claims was against the manifest weight of the evidence.
 {¶ 33} We address one final contention by appellant. Appellant maintains he was hampered in presenting his case because of the failure of appellees to identify the names of the van driver, the van driver's assistant, and the other inmate transported to CMC on July 11, 2001. Appellant argues that the Court of Claims erred in ignoring the inference that should have been drawn in his favor based upon appellees' failure to uncover such information during the discovery process. We disagree.
 {¶ 34} There is no evidence that appellees acted in bad faith in failing to find the requested documents. The Court of Claims heard testimony from Sayers, an institutional investigator with CMC, who performed a record search, but was unable to come up with the names of those individuals. Sayers was first asked to check this information approximately two years after the events, in August 2003, following a discovery request. Further, as previously noted, appellant waited approximately four months following the van transport to file an institutional grievance. *Page 13 
 {¶ 35} Here, the record indicates that appellees provided an explanation for the failure to obtain the discovery request, and, while the Court of Claims may have been entitled to draw an adverse inference based upon appellees' failure to find the documents at issue, it was not required to do so. See Cherovsky v. St. Luke's Hosp. of Cleveland (Dec. 14, 1995), Cuyahoga App. No. 68326 (noting in jury trial that trial court's failure to give adverse inference instruction was not error; while such inference is permissible, it "only applies when there is no explanation for the failure to produce the missing evidence").
 {¶ 36} Based upon the foregoing, appellant's first, second, and third assignments of error are without merit and are overruled, and the judgment of the Ohio Court of Claims is hereby affirmed.
Judgment affirmed.
SADLER, P.J., and WHITESIDE, J., concur.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Although appellant testified that he thought he was transported to CMC on July 9, 2001, he acknowledges in his appellate brief that he was transported on July 11, 2001.
[2] In contrast to appellant's trial testimony that the brakes "were on," appellant's complaint alleged that "the wheelchair brakes were loose." (Appellant's complaint at ¶ 4.) *Page 1