[Cite as *Rex v. Univ. of Cincinnati College of Medicine*, 2013-Ohio-1514.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DOUGLAS REX, et al.

    Plaintiffs

    v.

UNIVERSITY OF CINCINNATI COLLEGE OF MEDICINE

    Defendant

Case No. 2009-04637

Magistrate Anderson M. Renick

DECISION OF THE MAGISTRATE

{¶ 1} Plaintiffs filed this action alleging medical negligence based upon treatment provided to plaintiff, Douglas Rex, by Robert Bracken, M.D., an employee of defendant, the University of Cincinnati College of Medicine (UC).[1]  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} In the spring of 2008, plaintiff was diagnosed with prostate cancer. Plaintiff's oncologist, Leslie Oleksowicz, M.D., referred him to Dr. Bracken to explore treatment options.  On April 30, 2008, Dr. Bracken met with plaintiff and recommended that he undergo robotic wide excision radical prostatectomy.  According to plaintiff, Dr. Bracken represented to him that such a procedure was less invasive than other procedures, resulting in little to no bleeding and a relatively quick recovery period.

{¶ 3} During pre-operative meetings on April 30, 2008, and May 7, 2008, Dr. Bracken learned that plaintiff had a medical history of atrial fibrillation, a heart condition that can cause clotting of the blood, and episodes involving a deep vein thrombosis (DVT) in both 2001 and 2003 for which he had been prescribed Coumadin, an anticoagulant that slows the body's ability to stop bleeding.  As a part of the treatment

---

[1]For the purposes of this decision, "plaintiff" shall refer to plaintiff Douglas Rex.

plan and in preparation for surgery, Dr. Bracken instructed plaintiff to stop taking Coumadin 10 days prior to the procedure, and he prescribed two daily doses of Lovenox, a short-term anticoagulant, at 145 milligrams (mg) per dose. Such a form of treatment is known as "bridging therapy," where a patient is switched from one anticoagulant to another shortly before surgery.

{¶ 4} The procedure was performed on May 12, 2008, at University Hospital in Cincinnati, Ohio. The robotic surgery is performed laparoscopically, where the surgeon inserts probes and manipulates a camera and tools. During the procedure, the operating table was slanted with plaintiff's head lowered toward the floor, known as the steep Trendelenburg position, and his abdomen was inflated with carbon dioxide (insufflation) to displace his internal organs so that the surgeons had better access and visualization of the surgical field. After the prostate was removed, Dr. Bracken attached the bladder to the urethra and reconstructed the bladder neck. The surgery lasted approximately seven hours and plaintiff lost a significant amount of blood. After the surgery, plaintiff was transferred to the intensive care unit (ICU) for further treatment and observation.

{¶ 5} Plaintiff asserts that, following the surgery, he began to experience blurred vision and difficulty focusing. Plaintiff testified that he was not fully aware of his surroundings for two weeks following the surgery; however, once he was moved to a different floor of the hospital, he began to notice difficulty seeing the television, dark spots in his vision, and blurred vision. Plaintiff testified that, on multiple occasions, he informed UC medical staff about his vision difficulties. According to plaintiff, on June 19, 2008, Dr. Bracken told him that his vision difficulties were related to the medication he received during the operation and that his vision would improve. On August 1, 2008, plaintiff complained to Dr. Bracken that his vision had not improved. Dr. Bracken scheduled an appointment for plaintiff at the Cincinnati Eye Institute where he was diagnosed with Ischemic Optic Neuropathy (ION). Plaintiffs allege that Dr. Bracken's

actions fell below the standard of care both by failing to consult with plaintiff's cardiologist regarding "bridging therapy" and by incorrectly calculating the appropriate dosage of Lovenox. Plaintiffs further allege that significant surgical bleeding during the surgery proximately caused plaintiff's vision problems.

{¶ 6} "In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), paragraph 1 of the syllabus. The appropriate standard of care must be proven by expert testimony. *Id.* at 130. "[E]xpert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue." *Stinson v. England*, 69 Ohio St.3d 451, 1994-Ohio-35, paragraph one of the syllabus.

{¶ 7} Dr. Bracken is a board-certified urologist and professor of surgery with the University of Cincinnati and he has published numerous peer reviewed journal articles on urologic cancer research and treatment. At the time of plaintiff's operation, Dr. Bracken had performed approximately 200 robotic prostatectomy surgeries and approximately 1,500 open prostatectomy surgeries. According to Dr. Bracken, bridging therapy has been practiced for more than 10 years and has now become the standard of care for treating patients with a history of DVTs. Dr. Bracken testified that he determined that bridging therapy was appropriate given plaintiff's medical history and that he consulted with two UC physicians who specialize in internal medicine about the dosing level for Lovenox. Dr. Bracken related that the dosage recommendation was for one mg of Lovenox per kilogram of body weight, which equated to 145 mg twice per

day.  According to Dr. Bracken, one of the internal medicine physicians recommended additional testing to confirm the proper dosage.  Dr. Bracken testified that the additional blood testing confirmed creatinine clearance levels in line with plaintiff's known baseline, resulting in no reduction in the Lovenox dosage for bridging therapy.

{¶ 8} Regarding the procedure, Dr. Bracken opined that plaintiff received the proper dosage of anticoagulant medication.  Dr. Bracken explained that a patient who is over- anticoagulated will bleed from every blood vessel that is cut and that all patients are to some extent anticoagulated prior to surgery.  According to Dr. Bracken, the significant bleeding encountered during plaintiff's surgery occurred during reconstruction of the bladder neck and that such bleeding is not typical of a patient who is over-anticoagulated.  Dr. Bracken asserted that bleeding encountered at a surgical cite is a typical complication of surgery.  Dr. Bracken further testified that despite administration of Lovenox prior to surgery, plaintiff suffered a DVT on May 14, 2008, and that a filter was inserted to prevent the clot from migrating to plaintiff's lung.  Dr. Bracken related that the records from his examinations of plaintiff do not note any complaints of vision problems until August 1, 2008.  Dr. Bracken testified that after learning of plaintiff's vision problems, he referred plaintiff to an opthamologist to ensure prompt attention to his vision difficulties.

{¶ 9} Plaintiffs' expert, Michael Mathers, M.D., is a board-certified urologist and has participated in several hundred prostatectomies, although he has never been the primary surgeon on a robotic assisted prostatectomy.  Dr. Mathers testified that Dr. Bracken's administration of Lovenox prior to the procedure did not meet the standard of care. According to Dr. Mathers, plaintiff's history did not place him in the "high risk" category of patients for whom bridging therapy was recommended.  Dr. Mathers based his opinion upon an article that was published in the Cleveland Clinic Journal of Medicine, which addresses candidates for bridging therapy.  (Plaintiffs' Exhibit 68.)  Dr.

Mathers explained that most patients who are on Coumadin do not require bridging therapy.

{¶ 10} According to Dr. Mathers, a high risk patient would have a known hypercoagulable state, a DVT within the previous three months, and atrial fibrillation. Dr. Mathers stated that plaintiff's medical history does not suggest a reoccurrence of atrial fibrillation; however, Dr. Mathers was under the mistaken belief that plaintiff had only had one previous DVT. Dr. Mathers testified that plaintiff was a "low risk" category patient for whom bridging therapy was not advised, although he was unaware that plaintiff had received bridging therapy in 2006 for knee surgery. Dr. Mathers opined that a patient with a medical history similar to that of plaintiff with two previous DVTs, should have had a consultation with a cardiologist regarding the proper dosage of Lovenox.

{¶ 11} Ronney Abaza, M.D., a board-certified urologist and an assistant professor at The Ohio State University, testified as an expert for defendant. Dr. Abaza has performed approximately 2,000 robotic prostatectomies during his career and he has published approximately 35 articles on robotic surgery. Dr. Abaza testified that he routinely administers Lovenox to his patients and that all of his patients are somewhat anticoagulated prior to surgery. Dr. Abaza opined that the pre-operative treatment Dr. Bracken provided to plaintiff met the standard of care. According to Dr. Abaza, bridging therapy with Lovenox is appropriate for a patient who has received Coumadin prior to surgery. Dr. Abaza testified that the standard of care requires that the surgeon assess the reason for the Coumadin prescription, typically by consulting with the prescribing physician and consulting with a cardiologist about the dosing requirements of Lovenox. Dr. Abaza explained the risk factors for developing a DVT and he opined that a surgeon must perform a risk-benefit analysis. According to Dr. Abaza, the "rule of thumb" is that it is easier to treat bleeding than it is to treat a blood clot inasmuch as clotting can cause a stroke.

{¶ 12} Dr. Abaza testified that Dr. Bracken's treatment of plaintiff met the standard of care by consulting with the internists regarding the dosage of Lovenox. Dr.

Abaza further testified that bridging therapy was appropriate and within the standard of care given plaintiff's medical history and risk factors such as two prior DVTs, obesity, and cancer. Dr. Abaza opined that plaintiff was not over-anticoagulated during the surgery. According to Dr. Abaza, a patient who is over-anticoagulated will bleed everywhere contact is made during the surgery. Dr. Abaza explained that the bleeding that occurred in plaintiff's surgery was not typical of a patient who is over-anticoagulated and that it is not surprising that he lost two liters of blood.

{¶ 13} Based upon the foregoing, the court concludes plaintiffs have failed to prove that Dr. Bracken's preoperative and surgical treatment fell below the standard of care. Indeed, Dr. Bracken credibly testified that he consulted with two internists at UC about bridging therapy and the appropriate dosage of Lovenox. The court is convinced by Dr. Abaza's testimony that Dr. Bracken's actions met the standard of care and that bridging therapy was reasonable under the circumstances given plaintiff's medical history of atrial fibrillation, DVTs, obesity, and cancer. Furthermore, the court finds that plaintiffs failed to prove that the surgical bleeding proximately caused plaintiff's vision difficulties.

{¶ 14} Regarding the cause of plaintiff's vision loss, plaintiffs presented, by way of deposition, the testimony of Karl Golnik, M.D., a board-certified ophthalmologist and vice-chairman of the Department of Ophthalmology at UC. Dr. Golnik is also director of the Ophthalmology Residency Program at UC and a professor in the Department of Ophthalmology at the University of Louisville.[2] Dr. Golnik testified that plaintiff has bilateral optic neuropathy, most likely hypoperfusion neuropathy, a condition that is caused by a lack of blood and/or oxygen in the blood, leading to damage to both the nerves and visual tissue. According to Dr. Golnik, there are several important factors that control the amount of oxygen that the optic nerve receives. Such factors include

---

[2]Plaintiffs also presented the deposition of James Ernst, O.D., who testified that he could not give an opinion as to the cause of plaintiff's vision loss.

blood pressure, red blood count, and oxygen saturation; however, Dr. Golnik was unable to specifically identify any such deficiencies during the surgery that may have caused plaintiff's vision problems. Dr. Golnik testified that plaintiff suffered vision damage at some point between the time he underwent surgery and the time he regained consciousness.

{¶ 15} According to Dr. Golnik, optic neuropathy should plateau once it is discovered and the cause is eliminated. Dr. Golnik explained that within the first few weeks of hypoperfusion a patient's vision could continue to degenerate but that he would not expect the patient's vision to get worse after that initial time period. Dr. Golnik further testified that if plaintiff's vision problems continued to degenerate after his only evaluation on August 15, 2008, he would look for other factors to explain such vision difficulties. Dr. Golnik admitted that if plaintiff's vision continued to degenerate, it would call into question his initial diagnosis. Dr. Golnik asserted that plaintiff was not legally blind in August 2008.

{¶ 16} Andrew Lee, M.D., a board-certified neuro-ophthalmologist and chair of the Department of Ophthalmology at Methodist Hospital in Houston, Texas, testified as an expert for defendant. Dr. Lee testified that the exact cause ION is presently unknown; however, the condition is associated with several predisposing factors including age, gender, weight, diabetes, hypertension, and smoking. Dr. Lee explained that additional factors such as the duration of a surgery, blood loss, and blood pressure are risk factors for ION that are associated with surgery. Dr. Lee stated that vision loss following a robotic prostatectomy is rare, with one occurrence for every 60,000 surgeries. Dr. Lee testified that based upon plaintiff's medical records, plaintiff has regressed from reading vision to being legally blind in both eyes. Dr. Lee testified that plaintiff's vision loss occurred over a period of years after surgery and that such progressive loss of vision shows that the cause of the disease was not a surgical event. Dr. Lee opined to a reasonable degree of medical probability that plaintiff's surgery was not the cause of his

ION.  According to Dr. Lee, the evidence dose not support the conclusion that blood loss, low blood pressure, surgical time, or low hemoglobin caused plaintiff's ION.

{¶ 17} Based upon the foregoing, the court finds that plaintiffs have failed to prove that the treatment rendered by Dr. Bracken fell below the standard of care.  The court is persuaded by the testimony of Dr. Lee that the evidence does not support plaintiffs' assertion that plaintiff's vision difficulties were caused by surgical bleeding.  Furthermore, the court finds that Dr. Golnik's diagnosis of optic neuropathy is not consistent with plaintiff's history of progressive vision loss.  For the foregoing reasons, the court finds that plaintiffs have failed to prove any of their claims by a preponderance of the evidence and accordingly, judgment is recommended in favor of defendant.

{¶ 18} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ANDERSON M. RENICK
Magistrate

cc:

Brian M. Kneafsey, Jr.
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Gregory P. Hartmann
Joseph W. Shea III
Michelle A. Cheek
Shirley A. Coffey
119 West Central Parkway
300 Court Index Building
Cincinnati, Ohio 45202

003
Filed January 25, 2013
To S.C. Reporter April 16, 2013